**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

**v.**

**Jerry Durham DRYWALL, doing business as J & S Drywall, Respondent.**

**No. 91–3080.**

United States Court of Appeals, Eighth Circuit.

Submitted April 13, 1992.

Decided Sept. 9, 1992.

Rehearing Denied Oct. 8, 1992.

As Amended Nov. 19, 1992.

Donald W. Jones, Springfield, Mo., argued (Donald W. Jones, Timothy E. Gammon, Steven E. Marsh and Rebecca A. McCoy, on brief), for respondent.

Counsel who presented argument on behalf of the petitioner was John Fawley, Washington, D.C., argued (Collis Suzanne Stocking, John H. Fawley, Jerry M. Hunter, D. Randall Frye and Aileen A. Armstrong, on brief), for petitioner.

Before RICHARD S. ARNOLD, Chief Judge, ROSS, Senior Circuit Judge, and LOKEN, Circuit Judge.

ROSS, Senior Circuit Judge.

The National Labor Relations Board (the Board) petitions this court for enforcement of its May 24, 1991 order against Jerry Durham Drywall, doing business as J & S Drywall (the Company), in which the Board found that the Company had violated sections 8(a)(1) and (5) of the National Labor Relations Act (the Act), 29 U.S.C. §§ 158(a)(1) and (5), by failing to honor its collective bargaining agreement with the International Brotherhood of Painters and Allied Trades, Local 203 (the Union) from September 27, 1986, through March 31, 1987. The Company now argues there was no binding agreement with the Union, the unfair labor practice charge was not timely filed, and the Company was not subject to the Board's jurisdiction. Based on the following discussion, we decline enforcement.

## I.

Operating under the name J & S Drywall, Jerry Durham is engaged in the business of drywall finishing. During 1986 and

1987, the Company, as a subcontractor of Ozark Interiors, performed drywall finishing work on a number of commercial remodeling and construction jobs, most of which were located in the Springfield and Joplin, Missouri areas. Jerry Durham worked on the drywall jobs himself and hired other drywall finishers, as needed, to help him complete the jobs on schedule.

The record demonstrates that on or about July 29, 1985, Durham approached James Alderson, the business agent for the Union, and inquired about becoming a union contractor. Alderson responded that Durham would have to sign a contract, abide by its terms, and employ at least one journeyman.

On that same day, Durham went to the Union's office on East Sunshine Street with one of his workers, Brad Dunbar. Both signed up as members of the Union and made payments on their dues and initiation fees. According to the Union, on that same day Linda Alderson, the Union's secretary and James Alderson's wife, gave Durham two unsigned Union contract forms for him to take with him and consider. Among other things, the contract required that Durham, as a Union contractor, maintain workers' compensation and public liability and property damage insurance, as well as pay specified wages, make payments to the Union's fringe benefit funds, and post a bond to cover all deductions and contributions due the Union and the trust funds. On the following day, according to the Union, Durham gave James Alderson two copies of the contract, which Durham had signed and dated. Alderson claims that he signed both copies of the contract, returned one to Durham, and kept the other one. Thereafter, James Alderson delivered the signed contract to the Union's secretary.

## II.

◼ We first examine the Company's argument that the Board was without jurisdiction to consider this matter. Section 10(a) of the Act, 29 U.S.C. § 160(a), empowers the Board to "prevent any person from engaging in any unfair labor practice ... affecting commerce." The Supreme Court has stated that "an employer may be subject to the National Labor Relations Act although not himself engaged in [interstate] commerce." *NLRB v. Fainblatt*, 306 U.S. 601, 604, 59 S.Ct. 668, 670, 83 L.Ed. 1014 (1939). Although not mandated by Congress, the Board has set standards concerning the minimum annual dollar volume of certain types of businesses which must be exceeded before the Board will assert jurisdiction. For non-retail enterprises, Board jurisdiction exists when gross interstate inflow (purchases) or outflow (sales), whether direct or indirect, exceeds $50,000.00. *NLRB v. Timberland Packing Corp.*, 550 F.2d 500, 501 (9th Cir.), *cert. denied*, 434 U.S. 922, 98 S.Ct. 397, 54 L.Ed.2d 279 (1977). The Board has held the jurisdictional criteria "do not literally require evidentiary data respecting any certain 12-month period of operation." *Reliable Roofing Co.*, 246 NLRB 716, 716 n. 1 (1979). Instead, the Board may rely on figures for the most recent calendar or fiscal year, or the year just before the Board hearing. *Timberland Packing Corp., supra*, 550 F.2d at 501.

Here, the Board asserted jurisdiction over the Company based on its finding that the Company satisfied the indirect outflow standard. That standard required the Company to sell goods or services in excess of $50,000.00 to a company that meets the Board's jurisdictional standards. Between June 2 and December 31, 1986, the Company performed work for Ozark Interiors, a business engaged in interstate commerce,[1] amounting to approximately $23,157.00. During 1987, the Company billed Ozark Interiors for drywall finishing work amounting to $41,480.41, of which at least $35,000.00 was for the Holiday Inn construction project that the Company completed in May 1987. Therefore, because the Company's sales to Ozark Interiors

---

1. Ozark Interiors is a construction industry contractor in Springfield, Missouri, which purchased $97,238.00 worth of construction supplies, tools, and equipment from suppliers outside Missouri in 1986.

were in excess of $50,000.00 during the twelve-month period from June 1, 1986, through May 31, 1987, the Board properly exercised jurisdiction over this matter.

### III.

■ The Company next contends that, although Durham had considered becoming a union contractor, he had no binding agreement with the Union. Whether an agreement has been reached between two parties is a question of fact for the Board to determine. *UFCW, Local 304A v. NLRB*, 772 F.2d 421, 426 (8th Cir.1985). The Board's findings of fact are conclusive if supported by substantial evidence on the record as a whole. *United Exposition Serv. Co. v. NLRB*, 945 F.2d 1057, 1059 (8th Cir.1991).

■ The credited testimony in the record establishes that the parties entered into a binding collective bargaining agreement on or about July 29, 1985, which did not expire until March 31, 1987. On July 29, 1985, Durham approached the Union about becoming a Union contractor and received the contract from the Union's secretary. The ALJ credited James Alderson's testimony that Durham signed the agreement and subsequently delivered it to Alderson. Alderson then signed the agreement on behalf of the Union in Durham's presence and returned a signed copy to Durham.

Durham contends that he did not sign the Union contract until July 1986, and that this agreement was never finalized because he never received a copy of the contract signed by the Union. Durham claims that although he signed the agreement at that time, he informed Alderson within a couple of days that he could not be a Union contractor because he had been unable to obtain the necessary insurance and surety bond. The ALJ found that Durham's testimony was inconsistent with other corroborated testimony of James and Linda Alderson, including documentary evidence that Durham signed and dated the contract

"July 29, 1985," written with the same pen as Durham's signature.[2]

We conclude that the Board's determination that a collective bargaining agreement had been reached between the two parties is supported by substantial evidence on the record as a whole. The documentary evidence shows the signature of Jerry Durham dated July 29, 1985. There is no credible evidence which calls this finding into question. Further, we conclude that the Union would have nothing to gain by falsely asserting that the contract was signed on July 29, 1985, as opposed to some later date as Jerry Durham contends. The alleged events which are the basis of the charge in this case occurred after the date of signing claimed by either Alderson or Durham.

### IV.

Finally, the Company contends that, even assuming the existence of a binding bargaining agreement, the charge and complaint are barred by operation of the section 10(b) statute of limitations. *See* 29 U.S.C. § 160(b).

The National Labor Relations Act requires that a party, wishing to assert the existence of a violation of the Act, pursue its right in a timely manner. To achieve its purpose of providing minimum protection in the labor relations field, and at the same time prevent employers from having to defend themselves from stale, outdated claims, Congress provided a relatively short six-month limitations period with respect to unfair labor practice charges. *Id.* Where a section 8(a)(5) charge alleges that a party is refusing to abide by a collective bargaining agreement, the Board has held that the section 10(b) statute of limitations begins to run where there has been an unequivocal expression by one of the parties to repudiate the asserted contract.

---

**2.** The Board found that the "5" in the year "1985" may have been filled in by the Union secretary, Linda Alderson.

As is the case with the section 10(b) defense generally, the burden of showing that the charging party was on clear and unequivocal notice of the repudiation rests on the respondent. *A & L Underground*, 302 NLRB No. 76, 137 LRRM 1033, 1035 (1991). Therefore, "by requiring that a party promptly file a contract repudiation charge, we are not placing any hardship on the party challenging the repudiation." *Id.*

In *A & L Underground*, a document had been signed prior to the section 10(b) period and there was a dispute between the parties as to whether the agreement applied to more than a single project. In that case it was clear to the union, more than six months prior to the time the charges were filed, that the employer took the consistent position that the document was not a binding contract and was never intended to be binding on the employer. The Board in *A & L Underground* found the union's charges to be untimely, stating that "[o]nce a party has notice of a clear and unequivocal contract repudiation ... a dispute is clearly drawn. Indeed, it is at the moment of that repudiation that the unfair labor practice—the refusal to bargain—fundamentally occurs." *Id.* The Board concluded, "when a party ... has clearly and unequivocally given notice that it is totally repudiating its collective-bargaining agreement, we shall require that an unfair labor practice charge be filed within 6 months of the date of that total contract repudiation if the 10(b) time-bar is to be avoided." *Id.* at 1036.

Although notice of the repudiation in *A & L Underground* was apparent because of a letter expressly disavowing the agreement, a repudiation need not be an express, written repudiation but instead can be manifested in a variety of ways. For example, in *Metropol Restaurant*, 247 NLRB 132 (1980), a section 8(a)(5) refusal to bargain charge was filed almost three years after execution of a letter of agreement and a year and a half after the employer told the union that "there was no

contract." Shortly after signing the letter of agreement, the employer refused to make requisite contributions to the union funds, making it clear that it was not going to honor the contract. The Board ruled that the union's charge was barred by the section 10(b) statute of limitations. *Id.* at 137. Additionally, in *Natico, Inc.*, 302 NLRB No. 107, 138 LRRM 1121 (1991), the Board specifically held that "[t]he failure to make [union fund] payments month after month was itself tantamount to repudiation, and the Union was put on notice of the repudiation by the 'sheer length of time during which [the Respondent Employer] consistently failed to make payments.'" *Id.* at 1124–25. Also, in *Park Inn Home for Adults*, 293 NLRB 1082 (1989), the Board held that, where the respondent stopped making union fund contributions two years before the contract expired, the union was on notice of the repudiation of the obligation, despite intervening arbitration and discussion of the issue in negotiations. *Id.* at 1082–83.

These cases indicate that where an employer repeatedly fails to make union benefit fund contributions as required by a collective bargaining agreement, the union is put on notice that the employer has repudiated the agreement, thus triggering the commencement of the section 10(b) period for filing a charge. In the present case, the record is clear and all parties agree that Durham never made any contributions to the Union's fringe benefit funds, nor complied with the contract in any other manner. Durham's failure to ever comply with any of the terms of the contract and his continuing failure to pay into the Union's fringe benefit funds constituted a total repudiation of the contract.

It is clear that the Union was on notice as early as July or August of 1986 that Durham had repudiated the contract; in fact the Union's own witnesses testified that they knew Durham had repudiated the contract outside the 10(b) period. For example, James Alderson, business agent for the Union, testified that Jerry Durham never did anything to comply with, or treat as

effective, the alleged agreement. Linda Alderson, the Union's secretary, testified that she knew in July 1986 that Durham was not keeping up his end of the contract "in any way." In July 1986, James Alderson spoke with Durham at the St. John's Hospital job site. Alderson testified that Durham made it clear that he would not pay any more dues, that he was a non-union contractor, and that he was not working on any union jobs. Also at this time Durham told Alderson that he could not afford to be in the Union or pay Union scale wages and benefits. James Alderson admitted that as of August 13, 1986, he "felt like [Durham] had refudiated [sic] the contract."

The Union contends that in August 1986, it availed itself of its contractual right to picket to protest the Company's failure to pay into the fringe benefit funds. However, checks to the picketers for the August picket indicated that the reason for the pickets was for "organizing." Organizational picketing by the Union would have been unnecessary if the Union believed it had an effective collective bargaining agreement with the Company at that time. The record also reflects that, at the time of the picket, James Alderson referred to Durham's subcontractors as "rats," meaning non-Union workers.

■ The ALJ's finding of an unfair labor practice violation in the present case was based in part on his reliance on *Farmingdale Iron Works, Inc.*, 249 NLRB 98 (1980), enf'd mem., 661 F.2d 910 (2d Cir. 1981), where the Board relied upon a "continuing violation" theory. In *Farmingdale*, the Board held that the violations, based on the company's failures to make trust fund payments, were "separate and distinct" violations that could be litigated even though there had been similar failures to make payments prior to the 10(b) period. *Id.* at 99. The application of the continuing violation theory, however, is limited by the Board's finding that the *Farmingdale* respondent "did not convey a clear and unequivocal intention to repudiate" the collective-bargaining agreement until a date within the six-month limitation period. *Id.* at 98–99. When there is notice of a clear and unequivocal repudiation, the continuing violation theory no longer applies and a party is required to file its unfair labor practice charge within six months of receipt of such notice. *A & L Underground, supra*, 302 NLRB No. 76, 137 LRRM at 1034. Because the Union had clear and unequivocal notice of Durham's repudiation, the continuing violations theory does not apply.

Finally, we note that there was nothing equivocal in the Company's post-repudiation conduct which might be reasonably viewed as inconsistent with its earlier repudiation. Durham's August 1986 inquiry into bond requirements and wage and benefit rates after expressly stating that he did not consider himself bound by a Union contract did not diminish his position that there was no bargaining agreement currently in effect. Such ambiguous conduct will not detract from the otherwise express position of repudiation. *See Park Inn Home for Adults, supra*, 293 NLRB at 1082 (negotiations between the parties following company's repudiation offered "no clear evidence that [the company] in fact ever acknowledged a continuing obligation to [comply with the contract]"); *Natico, Inc., supra*, 302 NLRB No. 107, 138 LRRM at 1124–25 (employer's post-repudiation negotiations and "noncommittal remarks" were not inconsistent with repudiation).

### V.

We conclude that the record demonstrates that the Union had clear and unequivocal notice of Durham's repudiation of the contractual agreement not later than August 13, 1986, when the Union business agent admitted that he felt that Durham had repudiated the contract. Therefore, the Union's charge filed March 25, 1987, was outside the six-month statute of limitations period and thus the present charge is time-barred.

Accordingly, we agree with the finding that the Board properly exercised jurisdic-

tion over this matter and that there existed a valid bargaining agreement between the parties. We disagree, however, with the Board's conclusion that this matter was not barred by the statute of limitations, based on our conclusion that the Union had notice of the Company's total repudiation outside the 10(b) period. Accordingly, we decline the Board's petition for enforcement.