

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-13-1998

# NLRB v. Pub Serv Elec & Gas

Precedential or Non-Precedential:

Docket 97-3593

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation
"NLRB v. Pub Serv Elec & Gas" (1998). *1998 Decisions.* Paper 245.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/245

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed October 13, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 97-3593

NATIONAL LABOR RELATIONS BOARD,
        Petitioner

v.

PUBLIC SERVICE ELECTRIC AND GAS COMPANY,
        Respondent

On Petition for Enforcement of an
Order of the National Labor Relations Board
(NLRB No. 4-CA-22519)

Submitted under Third Circuit LAR 34.1(a)
October 5, 1998

Before: GREENBERG and MCKEE, Circuit Judges,
and LUDWIG,* District Judge

(Filed: October 13, 1998)

Margaret Ann Gaines
Supervisor Attorney
Anne Marie Lofaso
Attorney

_____

*Honorable Edmund V. Ludwig, Senior United States District Judge for
the Eastern District of Pennsylvania, sitting by designation.

Frederick L. Feinstein
Acting General Counsel
Linda Sher
Associate General Counsel
John D. Burgoyne
Acting Deputy Associate
General Counsel
Aileen A. Armstrong
National Labor Relations Board
1099 14th Street, N.W.
Washington, D.C. 20570

 Attorneys for Petitioner

Patrick R. Westerkamp
80 Park Plaza, T5E
P.O. Box 570
Newark, N.J. 07101

 Attorney for Respondent

OPINION OF THE COURT

GREENBERG, Circuit Judge.

I. JURISDICTION

This matter is before this court on a Petition for Enforcement of an order of the National Labor Relations Board ("Board"). The Board had subject matter jurisdiction under Section 10 of the National Labor Relations Act ("NLRA") which authorizes it to prevent unfair labor practices. See 29 U.S.C. S 160(a). We have jurisdiction to review a Petition for Enforcement pursuant to Section 10 of the NLRA. See 29 U.S.C. S 160(e).

II. FACTUAL AND PROCEDURAL HISTORY

A. FACTUAL HISTORY

Local 1576 of the International Brotherhood of Electric Workers is a labor organization that represents employees

2

of nuclear facilities. It is also a part of a larger organization known as System Council U-2 that represents 14 different locals. Although Local 1576 is a separate entity, System Council serves as its spokesperson in negotiations, arbitrations, and grievance procedures. In addition, Local 1576 is affiliated with the International Brotherhood of Electrical Workers, AFL-CIO ("International"), an even larger organization that represents its members by assisting the locals with negotiations and arbitrations.[1]

Public Service Electric and Gas Company ("PSE&G") is a utility that, inter alia, operates several nuclear generating stations on Artificial Island, Salem County, New Jersey. Local 1576 represents several groups of PSE&G's employees, including PSE&G's Radiation Protection Technicians ("RPT") whose function is to ensure safety by monitoring the radiological environment at various plants.

In the course of its normal operations, PSE&G undergoes "outages" in which a plant will go off-line or shut down for repairs or maintenance. Outages can last several months and either are planned or conducted on an emergency basis. During an outage, additional RPTs are required to monitor the plant. PSE&G traditionally has supplemented its RPT staff during outages by contracting with two independent contractors, Bartlett Nuclear and NSS Numanco.

Local 1576, System Council, and PSE&G are parties to a collective bargaining agreement effective from May 1, 1992, through April 30, 1996. Under the collective bargaining agreement, PSE&G is permitted to contract with independent contractors such as Bartlett and Numanco as long the independent contracting arrangement does not result in lay-off, curtailment, or downsizing of employees that Local 1576 represents. In addition, even though International is not a party to the collective bargaining agreement, the agreement provides that PSE&G agrees to recognize representatives of International as the representatives of Local 1576.

---

1. In its brief the Board explains that there have been changes to the union hierarchy that we describe, but as a matter of convenience we refer to the structure in place at the time of the events in this case.

In 1988, International began attempts to organize groups of employees of independent contractors such as Bartlett ("independent RPTs"). Beginning in the late 1980's, however, International began to question whether the independent RPTs were in fact controlled by the utilities that they serviced. Suspicions as to the true relationship between the independent RPTs and the utilities first arose when, during a hearing on an unfair labor practice charge, Bartlett took the position that a certain utility actually made the decisions and exercised control over the independent RPTs. Subsequently, in an unrelated unfair labor practice case, an administrative law judge held a utility, and not the independent contracting firm, liable for not hiring independent RPTs. In addition, when International attempted to organize independent RPTs, the independent contracting firms took the position, with which the Board agreed, that the utilities controlled the terms of the employment of the independent RPTs and that the contracting firms therefore would be unable to engage in a meaningful collective bargaining relationship. As a consequence of these three incidents, International abandoned attempts to organize independent RPTs and, instead, turned its attention to establishing the relationship among the independent RPTs, their contracting firms, and the utilities they serviced.

In order to ascertain the relationship among these entities, International prepared a questionnaire in 1993 directed at determining the financial relationship between the utilities and the independent contracting firms and the degree of supervision that the utilities exercise over the independent RPTs. The questionnaire was comprehensive, consisting of eight pages containing 79 questions. See app. at 136–43. International forwarded this questionnaire along with a sample cover letter directly or indirectly to each of its locals, including Local 1576, that represented in-house RPTs at utilities that used certain independent contracting firms. International asked that the locals in turn forward a request to their utilities to answer the questionnaire.

During this same time period, System Council and Local 1576 were experiencing problems with PSE&G resulting from its subcontracting arrangements. For example, since

4

approximately 1991, the local's business agents had been complaining that they were having difficulties obtaining information from PSE&G concerning its subcontracting relationships. System Council asserted that while PSE&G would inform Local 1576 when it was retaining an independent contracting firm, it would not provide any information as to the nature of the work to be performed, how many independent RPTs were being hired, how long they would be retained, or who would supervise them. See app. at 255. System Council also asserted that while outages normally lasted only several months, PSE&G retained many independent RPTs during non-outage periods. In addition, System Council asserted, without contradiction, that beginning in 1990 and continuing to the time of the hearing in this case, there had been little or no expansion in the number of union-represented RPTs at PSE&G. Id. at 256. These factors convinced System Council that PSE&G was retaining independent RPTs to avoid promoting or hiring other employees into the ranks of union-represented RPTs and that this conduct was affecting union employees at PSE&G adversely. Id.

On January 18, 1990, System Council and Local 1576 jointly filed a grievance alleging that PSE&G violated the collective bargaining agreement "by the de facto creation and maintenance of a `parallel work force' through multiple subcontracting of bargaining unit work ordinarily performed by . . . bargaining unit employees." In 1993, this grievance and other similar grievances against various companies were combined for arbitration. Soon after the start of the arbitration hearing, however, the parties suspended the arbitration process because they began engaging in what they described as "mutual gains" bargaining. Though the parties resolved several issues through this bargaining process, System Council asserts, without contradiction, that they did not resolve the issue concerning independent RPTs performing bargaining unit work.

System Council received the International letter and questionnaire and passed it along to Local 1576, asking Local 1576 to send the letter to PSE&G. Testimony indicated that System Council asked Local 1576 to send

5

the questionnaire in hopes of obtaining information to pursue further the "parallel workforce" grievance. See app. at 262.

One of the in-house RPTs represented by Local 1576 testified that beginning in approximately 1990, he worked side by side with independent RPTs and observed that they performed the same work and worked the same hours as the union-represented RPTs. See app. at 317-23. He further testified that the supervisors of the union RPT's supervised the independent RPTs and that these supervisors played an active role in selecting which independent RPTs were hired. Moreover, PSE&G's supervisors assigned the independent RPTs work, scheduled their work hours, and disciplined them when necessary. In addition, the union RPT testified that he personally observed independent RPTs working for PSE&G during non-outage periods and that he had personal knowledge that both Bartlett and Numanco employees had remained with PSE&G for at least two years. He also testified that from 1990 to 1993, the number of union-represented RPTs at PSE&G either had decreased or remained the same. Id.

According to Local 1576, it sent PSE&G the letter and questionnaire prepared by International on May 18, 1993, based on the above information in order to investigate whether PSE&G's use of independent RPTs was affecting union-represented RPTs adversely. See app. at 286-89 (testimony of Local 1576's president); see also app. at 134-43 (letter and questionnaire). The letter expressed concern that PSE&G's use of Bartlett and Numanco and their employees was affecting the RPTs that Local 1576 represented adversely as the "operations erode the bargaining unit, endanger the financial integrity of negotiated wages and fringe benefits, and threaten union member's jobs." Id. at 134. The letter requested that PSE&G fill out the attached questionnaire requesting information concerning the financial and/or managerial relationship between PSE&G and Bartlett.

On June 11, 1993, PSE&G responded to Local 1576's letter stating that PSE&G does not operate and/or control either Bartlett or Numanco. See app. at 144-46. PSE&G's

6

letter further stated that "unless you can provide us with objective facts which establish that the information requested is relevant to the performance of your obligation as the collective bargaining representative of our employees, we do not intend to respond." Id. at 145. PSE&G asserted that because the collective bargaining agreement authorized its use of Bartlett and Numanco and did not affect the RPTs represented by Local 1576 adversely, its arrangement with Bartlett did not violate the collective bargaining agreement. Id. PSE&G also noted that because the accusations in Local 1576's letter would be encompassed in the pending "parallel workforce" grievance, the letter was not a good faith inquiry. Id. PSE&G further accused Local 1576 of encouraging it to enter into a "hot cargo" agreement, i.e., an illegal agreement whereby an employer agrees with a union to cease doing business with companies based on their non-union status. Id.

A representative of PSE&G testified that after Local 1576 sent its letter he spoke with a representative of Local 1576 who told him that he simply was doing his job in sending the letter and that "this was an International thing that . . . [they] wanted him to sign and he signed it." App. at 361. The Local 1576 representative testified that he remembered this conversation but denied that he made the particular statements attributed to him.

By letter dated August 30, 1993, Local 1576 responded to PSE&G's June 11, 1993 letter. See app. at 147-48. Local 1576 clarified that it was seeking information to investigate the extent to which PSE&G was using non-union personnel to perform work covered by the collective bargaining agreement. Local 1576 explained that this information was relevant to establish if "so called, contract employees, . . . may, in fact, be bargaining unit personnel." Id. at 147. Local 1576 also asserted that this matter was entirely separate from the pending "parallel workforce" grievance between the parties. The letter concluded by stating "I trust this will clarify any further questions you may have had and that the overdue information will be forthcoming in a timely manner." Id. at 148.

PSE&G responded to Local 1576's August 30 letter by letter dated September 19, 1993. See app. at 149. PSE&G

7

asserted that more specifics were required for it to determine whether it should furnish the requested information. Specifically, PSE&G quoted allegations from Local 1576's May 18, 1993 letter and stated that"[y]ou now more simply contend that unnamed persons are performing unidentified work normally performed by represented employees." Id. The letter concluded by stating:

> Both the generality of this charge, and your failure to specify the information which Local 1576 believes it needs to police the collective bargaining agreement, prevent us from responding to your request. More specifics are required before it can be determined whether the Union has requested relevant information which [PSE&G] either possesses or has a duty to disclose.

Id. This letter was the last correspondence between the parties prior to this litigation; PSE&G never provided the requested information and Local 1576 did not send further requests for the information.

B. PROCEDURAL HISTORY

On March 4, 1994, International filed a charge with the Board alleging that PSE&G violated Section 8(a)(5) and (1) of the NLRA by refusing to provide the requested information which was purportedly necessary for and relevant to the representation of certain of PSE&G's employees. The Board issued a complaint based on this charge on July 22, 1994, and amended that complaint on July 31, 1994. An Administrative Law Judge ("ALJ") held a hearing on the complaint on October 15 and 16, 1996.

The ALJ held that by refusing to provide the information that Local 1576 requested, PSE&G violated Section 8(a)(5) and (1) of the NLRA. The ALJ accordingly issued an order dated January 28, 1997, requiring PSE&G to furnish the requested information. PSE&G filed exceptions to the ALJ's order with the Board. By Decision and Order dated July 11, 1997, the Board adopted the ALJ's decision and recommended order but modified the order to require PSE&G to "[f]urnish to the Union in a timely fashion the information requested by the Union in its letter and questionnaire dated May 18, 1993." The Board filed a

8

petition for enforcement of its July 11, 1997 Order with this court on November 17, 1997.

III. DISCUSSION

PSE&G asserts three points of error in this appeal. The first relates to procedural defects with International's unfair labor practice charge; PSE&G asserts that International did not file the charge timely and that the charge was not served properly. PSE&G's second point of error takes issue with the ALJ's finding that PSE&G was required to respond to the questionnaire because the requested information was relevant to aiding Local 1576 in fulfilling its duties as the representative of PSE&G's RPTs. PSE&G makes the final claim that Connecticut Yankee Atomic Power Co., 317 N.L.R.B. 1266 (1995), mandates a result contrary to that reached by the ALJ, and thus the Board, in this case.

A. Procedural Defects in Filing and Serving the Unfair Practice Charge

As we have indicated, PSE&G's initial assignments of error relate to alleged procedural defects in International's unfair practices charge. Specifically, PSE&G asserts that this charge was untimely filed and improperly served.

1. Assertion that Charge Was Untimely

Section 10(b) of the NLRA provides that "no complaint shall issue upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board . . . ." 29 U.S.C. S 160(b). The Board has held that the six-month limitation period begins to run when an aggrieved party has "clear and unequivocal notice" of a violation of the NLRA. See A & L Underground, 302 N.L.R.B. 467, 468 (1991). Several courts of appeals have recognized and applied the clear and unequivocal notice rule. See, e.g., Taylor Warehouse Corp. v. NLRB, 98 F.3d 892, 899 (6th Cir. 1996); United States Can Co. v. NLRB, 984 F.2d 864, 867 (7th Cir. 1993); NLRB v. Jerry Durham Drywall, 974 F.2d 1000, 1003 (8th Cir. 1992); NLRB v. Glover Bottled Gas Corp., 905 F.2d 681, 684 (2d Cir. 1990). As one court aptly noted:

9

The 10(b) period begins when the victim of an unfair labor practice receives unequivocal notice of a final adverse decision. Rumors or suspicions will not do . . . . Moreover, the decision must be final, and not subject to further change; knowledge that another party might commit an unfair labor practice when the time is right will not start the 10(b) period. While the victims of an unfair labor practice should be encouraged to file a charge with the NLRB as soon as possible, individuals should not be forced to file anticipatory or premature charges, challenging tentative or merely hypothetical decisions, in order to protect their statutory rights. The 10(b) period does not commence until an aggrieved party has knowledge of the facts necessary to support a present, ripe, unfair labor practice charge.

Esmark, Inc. v. NLRB, 887 F.2d 739, 746 (7th Cir. 1989) (footnotes omitted).

Because the six-month limitations period functions as an affirmative defense to an unfair practice charge the party, in this case PSE&G, relying on the defense has the burden of proof to establish the untimeliness of the charge. See Jerry Durham, 974 F.2d at 1004; A & L Underground, 302 N.L.R.B. at 469. Moreover, to establish the defense, PSE&G must prove that the factual conclusions of the ALJ were erroneous by convincing us that substantial evidence on the record as a whole does not support the conclusions. See, e.g., Taylor, 98 F.2d at 900; Glover Bottled Gas, 905 F. 2d at 685; see also NLRB v. Joy Tech., Inc., 990 F.2d 104, 107-08 (3d Cir. 1993) (noting that the substantial evidence standard of review is applicable to the Board's factual findings).

PSE&G asserts that Local 1576 had notice that PSE&G was refusing to provide answers to International's questionnaire when it received PSE&G's June 11, 1993 letter initially replying to Local 1576's request for information. Thus, in its view, because International did not file the unfair practice charge until March 4, 1994, its filing was untimely. PSE&G supports its position by pointing to testimony by the president of Local 1576 that he knew when he received PSE&G's June 11, 1993 letter that

10

PSE&G was not going to answer the questionnaire and that he did not think that his August 30, 1993 letter would change that status. See appellant's brief at 15-16; app. at 307-08. In addition, PSE&G discounts the import of its September 19 letter refusing to provide the requested information by citing to International Union, United Auto, Aerospace and Agric. Implement Workers of America, AFL-CIO v. NLRB, 363 F.2d 702, 706 (D.C. Cir. 1966), where the court held that an "attorney's reaffirmation of the Company's position arising out of a past action should not ordinarily of itself be sufficient to constitute a reoccurrence for the purpose of a limitation provision."

In addressing this issue, the ALJ found the charge timely filed. Applying the "clear and unequivocal" notice standard, the ALJ found that the language in PSE&G's June 11 letter "left open the possibility that [PSE&G] would comply with the request upon receipt of . . . `objective facts' . . ." showing how the information sought was relevant to Local 1576's duty as the employees' bargaining representative. Accordingly, the ALJ found that Local 1576 did not have clear and unequivocal evidence that PSE&G was engaging in unlawful conduct by June 11, 1993. In addition, the ALJ held that even if an unfair labor practice charge could have been filed as a result of PSE&G's June 11, 1993 letter, that did not mean that an unfair labor practice charge based on PSE&G's subsequent refusal in its September 19, 1993 letter to provide the information requested was precluded. See generally, Rest Haven Corp., 293 N.L.R.B. 617, 618 (1989) (holding that the Board did not err in finding a continuing violation where there was active conduct by the parties during the six-month limitations period).

Substantial evidence on the record as a whole supports the ALJ's finding that PSE&G's June 11, 1993 letter did not provide Local 1576 with clear and unequivocal notice that PSE&G was engaging in unlawful conduct. PSE&G's June 11, 1993 letter specifically left open the possibility that PSE&G would furnish the requested information if Local 1576 provided it with "objective facts which establish that the information requested is relevant to the performance of your obligation as the collective bargaining representative of our employees." See app. at 145. Because the six-month

11

limitations period is not meant to punish a party who delays in filing due to the ambiguous conduct of another party, International's charge should be considered timely filed. See A & L Underground, 302 N.L.R.B. at 469. The testimony relating to Local 1576's representative's subjective belief as to whether PSE&G ever would furnish the requested information should not alter this result; this evidence is not strong enough to overcome the ALJ's findings which are based solidly on the equivocal language of PSE&G's June 11, 1993 letter.

2. Assertion that Charge Was Improperly Served

PSE&G also asserts that International's charge was not served properly. Specifically, PSE&G asserts that because the record is devoid of proof of when the charge was served, the union has failed to carry its burden to establish jurisdiction. The Board counters that PSE&G is barred from raising this argument because it failed to object to service before the Board. The Board also asserts that, in any event, the claim is without merit because its Regional Director notified PSE&G by letter dated March 7, 1994, that a charge had been filed against it.

As noted by the ALJ, the Board sent PSE&G a letter dated March 7, 1994, notifying PSE&G that a charge had been filed against it. See supp. app. at 3-4 (March 7, 1994 letter). The letter also stated that a copy of the charge was being sent to PSE&G with the letter. Id. The return receipt for this letter reflects that PSE&G's agent received it on March 8, 1994. Because this evidence is sufficient to sustain the ALJ's finding that the charge was served properly, PSE&G's assertion of error on this point lacks merit.

B. Allegation that Local 1576 Was Requesting Information Solely for International

The parties agree that PSE&G had a duty to supply the requested information if it was relevant to aid Local 1576 in fulfilling its duties as the union representative for its members. See generally, NLRB v. Acme Indus. Co., 385 U.S. 432, 435-36, 87 S.Ct. 565, 568 (1967) (noting that "[t]here can be no question of the general obligation of an employer to provide information that is needed by the bargaining

12

representative for the proper performance of its duties.").
PSE&G contends, however, that Local 1576 did not make
its request for information in good faith because it had no
interest in obtaining the information; according to PSE&G,
Local 1576 really was requesting the information solely on
behalf of International so that International could use the
information in its attempts to organize the employees of
independent contracting firms. See brief at 18-25.

The ALJ held that Local 1576 satisfied its burden of
showing that it reasonably believed that the requested
information was relevant to its statutory duties.
Specifically, the ALJ accepted the union RPT's testimony
that PSE&Gs' supervisors were controlling the independent
RPTs, these employees were being retained for up to two
years and during non-outage periods, and these employees
were performing the same type of work as the union-
represented RPTs. On the basis of this evidence, the ALJ
found that Local 1576 reasonably could have believed that
the allegedly independent RPTs were actually bargaining
unit employees that PSE&G was using to circumvent the
collective bargaining agreement. The ALJ also noted that
the information requested would be relevant to help Local
1576 determine whether these employees were performing
bargaining unit work thereby diminishing the work to
which Local 1576's members were entitled. The ALJ further
noted that the information sought was relevant to Local
1576's pending "parallel workforce" grievance against
PSE&G.

The ALJ specifically rejected PSE&G's argument that
Local 1576 requested the information solely for
International's benefit. The ALJ noted that PSE&G offered
no evidence to substantiate its claim that Local 1576 was
without knowledge or did not approve of the filing of the
charge on its behalf. In addition, the ALJ found that
PSE&G was not relieved of its duty to supply information
relevant to Local 1576's role as representative of PSE&G's
employees simply because the information also might have
benefited International. See generally, NLRB v. Associated
Gen. Contractors, 633 F.2d 766, 772 (9th Cir. 1980)
(holding that the potential use of requested information for
organizational purposes does not relieve an employer of its

13

duty to supply the information if it is relevant); Central Manor Home for Adults, 320 N.L.R.B. 1009, 1011 (1996) (noting that if information is relevant to the union's duties, it is not germane that the information may be requested for other reasons). The ALJ also credited the testimony indicating that International had abandoned efforts to organize the independent RPTs and reasoned that this testimony undermines PSE&G's position that the information was for International's benefit.

The Board asserts that there is substantial evidence to support the ALJ's finding that the requested information was relevant in aiding Local 1576 to represent its members. Specifically, the Board points to the testimony on which the ALJ relied relating to the type of work and the supervision of the independent RPTs at PSE&G. In addition, the Board points to evidence that the number of union-represented RPTs at PSE&G had remained stagnant since 1990 while the total number of positions increased. The Board argues that, in light of this evidence, the requested information was relevant to determining: (1) whether PSE&G or Bartlett was the true employer of the independent contracting employees; (2) whether PSE&G was allowing these employees to perform union work; (3) whether PSE&G was in breach of the collective bargaining agreement by failing to extend certain benefits to these employees; and (4) the strength of Local 1576's "parallel workforce" grievance against PSE&G.

The standard for relevance is cases such as this is not demanding; it has been characterized as a "discovery-type" standard. Acme, 385 U.S. at 437 n.6, 87 S.Ct. at 568 n.6; NLRB v. New Jersey Bell Tel. Co., 936 F.2d 144, 150 (3d Cir. 1991). In addition, our standard of review is deferential; the ALJ's factual determinations are entitled to a substantial degree of deference. See generally, NLRB v. George Koch Sons, Inc., 950 F.2d 1324, 1330-32 (7th Cir. 1991) (upholding Board's decision in similar refusal to provide information case and noting that the issue is predominately factual and subject to a significant degree of deference). Under these standards, the record evidence identified by the ALJ and by the Board in its brief on appeal substantially support the ALJ's findings that the

14

information that Local 1576 requested was relevant to its duties and that Local 1576 adopted the International questionnaire for purposes of obtaining this information. In addition, as noted by the ALJ, it is irrelevant that the information also may have benefited International. See, e.g., Associated Gen. Contractors, 633 F.2d at 772; Central Manor Home for Adults, 320 N.L.R.B. at 1011. Consequently, PSE&G's assignment of error on this point lacks merit.

C. Application of Connecticut Yankee

PSE&G further asserts that the Board's decision in Connecticut Yankee Atomic Power Co., 317 N.L.R.B. 1226 (1995), is indistinguishable from this case and mandates a reversal of the ALJ's decision. In Connecticut Yankee, a union brought an unfair labor practice act against a utility for refusing to answer International's questionnaire. After International sent the company its questionnaire, the company initially responded by denying any financial relationship with Bartlett and refusing to answer the majority of questions on the questionnaire. International responded by asserting that the information was relevant to determine whether the utility and Bartlett were joint employers which would subject Bartlett to the collective bargaining agreement between the parties.

The Board held that the utility did not violate the NLRA by refusing to respond to the questionnaire because International had failed to carry its burden of proving that the requested information was relevant. The Board initially noted that under the collective bargaining agreement between the parties, a joint employer relationship would not subject Bartlett to the terms of the collective bargaining agreement unless the parties consented. Because there was no record of the required consent by the parties, the Board reasoned that the information requested by the questionnaire was not relevant to enforcement of the collective bargaining agreement.

The Board further held that the evidence was insufficient to support a finding that the utility's use of Bartlett's employees affected the union-represented RPTs. Specifically, the Board noted that the record revealed that

15

the number of bargaining unit positions at the utility had increased substantially during the time period in question. The Board further noted that there was no allegation that union-represented RPTs had lost continuous employment or permanent promotional opportunities. The Board also noted that the union never had filed a grievance concerning the utility's use of Bartlett personnel.

We agree with the ALJ that Connecticut Yankee is distinguishable from this case. First, the theory of relevance for the requested information in Connecticut Yankee was very different from the theory advanced in this case. Because the relevance inquiry is fact specific, the Board's relevancy analysis in Connecticut Yankee based on a joint employer theory is largely inapposite. In addition, testimony was offered that PSE&G's use of the independent RPTs was affecting union-represented RPTs adversely; independent RPTs were being retained for long periods of time and performing the same work and the number of union-represented RPTs was remaining stagnant. In addition, Local 1576 had filed a parallel work force grievance to which the requested information would be relevant. For these reasons, the ALJ properly held that the Board's holding in Connecticut Yankee does not control this case.

IV. CONCLUSION

For the foregoing reasons we reject all of PSE&G's contentions and will enter a judgment enforcing the order of July 11, 1997.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

16