# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 01-2363
No. 01-2764

_____

McKenzie Engineering Company,     *
     *
   Petitioner - Cross-Respondent,   *
     *  Petitions for Review or
   v.     *  Enforcement of an Order of the
     *  National Labor Relations Board.
National Labor Relations Board,     *
     *
   Respondent - Cross-Petitioner.   *

_____

Submitted:  April 15, 2002

Filed:  September 12, 2002 (Corrected:  10/04/02)

_____

Before WOLLMAN, LOKEN, and MURPHY, Circuit Judges.

_____

LOKEN, Circuit Judge.

In late 1996, McKenzie Engineering Co. ("McKenzie") was in a dispute with the United Brotherhood of Carpenters and Joiners (the "Carpenters") after McKenzie fired four members of Carpenters Local 410 and replaced them with non-union workers on a project to repair a dam in Keokuk, Iowa.  In December, McKenzie began work on an unrelated project to repair part of the Crescent Bridge that crosses the Mississippi River between Rock Island, Illinois, and Davenport, Iowa.  Angry at Local 410 over the Keokuk dispute, McKenzie's president, Robert McKenzie, rejected a request by Carpenters Local 166 that its members be assigned carpenters'

work on the Crescent Bridge project.  Instead, McKenzie entered into a "one trade" agreement with Local 150 of the International Union of Operating Engineers (the "IUOE").  For background regarding both disputes, see McKenzie Eng'g Co. v. NLRB, 182 F.3d 622, 624-26 (8th Cir. 1999), and Carpenters Fringe Benefit Funds v. McKenzie Eng'g, 217 F.3d 578 (8th Cir. 2000).

Carpenters Local 166 filed an unfair labor practice charge with the National Labor Relations Board.  After an evidentiary hearing, the Board ruled that McKenzie violated Sections 8(a)(1) and 8(a)(5) of the National Labor Relations Act (NLRA), 29 U.S.C. § 158(a)(1), (5), by repudiating a "pre-hire" agreement with Local 166. McKenzie petitions for review of this decision; the Board cross-petitions to enforce its order.  We conclude the Board's General Counsel failed to prove that McKenzie either repudiated or unilaterally modified a pre-hire agreement.  Thus, there was no unfair labor practice, and we decline to enforce the Board's order.

## I. Background.

McKenzie is a marine construction firm based in Fort Madison, Iowa.  It is a union contractor and has entered into pre-hire agreements with most of the craft unions whose members work on marine construction projects in McKenzie's trade areas.  Each craft union claims a traditional work jurisdiction -- for example, carpenters work with wood, and operating engineers operate machinery.  The claims are broad and frequently overlap, triggering contentious work assignment issues. The Crescent Bridge project involved both a demolition and a construction phase.  The demolition phase began in December 1996.  McKenzie employed a crew of five to seven for this phase.  All but one had worked for McKenzie on the earlier project in Keokuk.  The crew included members of the IUOE and the Laborers Union but no carpenters.  This dispute does not involve the demolition phase work.

In mid-December, with the demolition phase underway, business agents for Carpenters Local 166 and the Laborers Union local visited the Crescent Bridge site and told Robert McKenzie that he had collective bargaining agreements with both unions and they expected him to employ union members and pay the negotiated fringe benefits for any laborer or carpenter work. Robert McKenzie replied that he did not need any laborers on this project; the record reflects no further contacts between McKenzie and the Laborers Union. Carpenters Local 166's business agent, Paul Delcourt, claimed all pile driving and timber-replacement work during the construction phase of the project. Robert McKenzie told Delcourt about McKenzie's on-going dispute with Carpenters Local 410. Mr. McKenzie said he would not start the construction phase before mid-January and would decide then whether to assign Local 166 members to the project crew.

Delcourt visited the job site in mid-January and observed work being done that he considered within the jurisdiction of the Carpenters. At a January 31 meeting, Robert McKenzie told Local 166 representatives, "I want to deal with you. I want to get this thing resolved," but "[l]et's try to get [the Local 410 dispute] resolved first." On February 5, Robert McKenzie met again with Local 166 representatives, who for the first time showed him a copy of a 1988 contract between McKenzie and the Northwest Illinois District Council of Carpenters covering a trade area that included the Illinois side of the Crescent Bridge. Mr. McKenzie passed the document back to the union representatives without comment, and the February 5 meeting ended without a resolution of Local 166's demands.

Later that day, Robert McKenzie contacted Jack Schadt, the business agent for IUOE Local 150, and offered to sign a one-trade agreement assigning all marine construction work on the Crescent Bridge project to Local 150. The agreement was signed that day in the form of an addendum to McKenzie's Dredge Maintenance Agreement with the IUOE. Local 150 then granted IUOE permits to the members of McKenzie's crew who were not IUOE members. This permitted McKenzie to

complete the Crescent Bridge project using the crew he had brought from Iowa, while paying wages and fringe benefits in accordance with McKenzie's agreement with the IUOE. The project was completed in late March. No member of Carpenters Local 166 worked on the project.

Local 166 began picketing the Crescent Bridge work site on February 6 but ceased picketing because of McKenzie's agreement with IUOE Local 150. Paul Delcourt and Jack Schadt met to discuss the situation shortly after Local 150 entered into the one-trade agreement. Each advised the other that his union had a pre-hire contract with McKenzie. Schadt testified that Delcourt wanted Carpenters union members to do the pile driving work on the Crescent Bridge project. But when Schadt offered to let one or two carpenters work on the project under the IUOE contract if McKenzie would agree, Delcourt responded, "well, [it] doesn't make a lot of difference, McKenzie's done any way, he's out of business any way." The Carpenters then filed this unfair labor practice charge.

## II. The Nature of Pre-Hire Agreements.

To guarantee employees freedom of choice and majority rule, the NLRA prohibits an employer and a union from entering into a collective bargaining agreement granting exclusive representational status if the union was not chosen by a majority of the employees in the bargaining unit. See Int'l Ladies' Garment Workers' Union v. NLRB, 366 U.S. 731, 737-38 (1961). In 1959, Congress enacted § 8(f) of the NLRA, 29 U.S.C. § 158(f), to modify this rule for the construction industry. As the Supreme Court explained in Jim McNeff, Inc. v. Todd, 461 U.S. 260, 266 (1983) (citations omitted):

> [Section] 8(f) allows construction industry employers and unions to enter into agreements setting the terms and conditions of employment for the workers hired by the signatory employer without the union's

majority status first having been established in the manner provided for under § 9 of the Act.  One factor prompting Congress to enact § 8(f) was the uniquely temporary, transitory, and sometimes seasonal nature of much of the employment in the construction industry.  Congress recognized that construction industry unions often would not be able to establish majority support with respect to many bargaining units.  Congress was also cognizant of the construction industry employer's need to "know his labor costs before making the estimate upon which his bid will be based" and that "the employer must be able to have available a supply of skilled craftsmen for quick referral."

For many years, the Board held that a construction industry employer could unilaterally repudiate a § 8(f) pre-hire agreement any time prior to the union attaining majority status.  The Supreme Court upheld this rule as "a defensible construction of the statute" in NLRB v. Local Union No. 103, Int'l Ass'n of Bridge Workers, 434 U.S. 335, 350 (1978).  However, the Board overturned its rule permitting repudiation in John Deklewa & Sons, Inc.,[1] holding that an employer violates § 8(a)(5) by repudiating a § 8(f) pre-hire agreement before its expiration, unless employees have voted to reject the union in a Board-conducted election.  At the start of the hearing in this case, the General Counsel's attorney invoked the Deklewa principle, defining the issue as whether McKenzie "repudiated its [pre-hire] contract with" Carpenters Local 166 when McKenzie refused to apply the contract to employees performing work on the Crescent Bridge project that was within the scope of that agreement.[2]

---

[1]282 N.L.R.B. 1375 (1987), enforced sub nom. Int'l Ass'n of Bridge Workers, Local 3 v. NLRB, 843 F.2d 770 (3d Cir. 1988), cert. denied, 488 U.S. 889 (1988).

[2]The Deklewa rule has prompted a conflict in the circuits that the Supreme Court has not yet resolved.  See the cases cited in 1 THE DEVELOPING LABOR LAW 962 n.1120 (Hardin et al. eds., 4th ed. 2001).  But this court has expressly upheld the rule.  See NLRB v. W.L. Miller Co., 871 F.2d 745, 747-48 (8th cir. 1989).

# III. Discussion.

**A. Applicable Breach of Contract Principles.**  In his decision concluding that McKenzie committed an unfair labor practice, Administrative Law Judge William Pannier defined the applicable legal principle more broadly than the repudiation of a pre-hire agreement:

> Of course, it is indisputable that a party to a collective-bargaining contract -- be it employer or union -- "violated Section 8(a)(5) and (1) and Section 8(d) of the Act [or Section 8(b)(3), in the case of a union] whenever it fails to honor a collective-bargaining contract by applying its terms to all employees covered by the contract."  That obligation exists no less to collective-bargaining contracts arising under Section 8(f) of the Act, as is the situation presented here.

For authority, the ALJ cited only his own opinion in <u>Diversified Bank Installations, Inc.</u>, 324 N.L.R.B. 457 (1997).  In <u>Diversified</u>, he cited one federal court case for this proposition, <u>W.R. Grace & Co. v. Local Union 759, Int'l Union of the United Rubber Workers</u>, 461 U.S. 757, 771 (1983).  <u>Grace</u> involved a lawsuit under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185, for judicial enforcement of an arbitration award under a collective bargaining agreement.  For the general proposition that collective bargaining agreements must be honored, the Court cited <u>Charles Dowd Box Co. v. Courtney</u>, 368 U.S. 502 (1962), another § 301 case.  In reviewing the legislative history of § 301, the Court explained in <u>Dowd Box</u>:

> The bill which the Senate originally passed . . . contained a provision making a breach of a collective bargaining agreement an unfair labor practice subject to the jurisdiction of the National Labor Relations Board . . . . In conference, however, it was decided to make collective bargaining agreements enforceable only in the courts.  "Once parties have made a collective bargaining contract," the conference report

stated, "the enforcement of that contract should be left to the usual processes of the law and not to the National Labor Relations Board."

368 U.S. at 510-11 (citations omitted); see Allied Chem. Workers v. Pittsburgh Plate Glass Co., 404 U.S. 157, 186-87 (1971). In other words, the ALJ's broad assertion that the Board has unfair labor practice jurisdiction over all breaches of collective bargaining agreements was contrary to § 301 as construed by the Supreme Court.

However, while "the Board has no plenary authority to administer and enforce collective bargaining contracts . . . . the Board may proscribe conduct which is an unfair labor practice even though it is also a breach of contract remediable as such by arbitration and in the courts." NLRB v. Strong, 393 U.S. 357, 360-61 (1969). In this regard, the Board does not exceed its jurisdiction by "necessarily construing a labor agreement to decide [an] unfair labor practice case." NLRB v. C & C Plywood Corp., 385 U.S. 421, 428 (1967). In such a case, we review the Board's interpretation of the collective bargaining agreement *de novo*, not deferentially. Litton Fin. Printing v. NLRB, 501 U.S. 190, 202-03 (1991).

The Board adopted the ALJ's conclusion that McKenzie violated §§ 8(a)(5) and (1) "by failing and refusing to honor" its pre-hire agreement with the Carpenters. Citing its decision in Deklawa and our decision in Miller, the Board explained, "It is well settled that an employer may not repudiate an 8(f) agreement during its term." Unlike the ALJ, the Board thereby kept its decision within the recognized framework of § 8(f) precedents. An employer's repudiation of a collective bargaining agreement with a majority-status union has long been held to be a violation of the § 8(a)(5) duty to bargain. See NLRB v. M & M Oldsmobile, Inc., 377 F.2d 712, 715-16 (2d Cir. 1967). Deklawa applied that principle to pre-hire agreements, and we have upheld that ruling.

So, too, it is well-accepted that an employer violates its § 8(a)(5) statutory duty to bargain when it unilaterally modifies a term in a collective bargaining agreement with a majority-status union that relates to a mandatory subject of collective bargaining. See Allied Chem. Workers, 404 U.S. at 185, construing NLRA § 8(d). It is reasonable for the Board to apply the same rule if an employer unilaterally modifies a pre-hire agreement, even if the employer does not otherwise intend to repudiate the agreement. However, in deciding whether the employer has unilaterally modified the agreement by refusing to perform a term relating to a mandatory subject of collective bargaining (such as assignment of work to union members), the Board must take into account the essential nature of a pre-hire agreement, including the fact that the union does not yet represent a majority of the construction industry employees on a particular project. It is to that issue that we now must turn.

**B. Did McKenzie Breach a Pre-Hire Agreement?** McKenzie signed a Carpenters standard form pre-hire agreement in 1988 to avoid a labor dispute at a small project in Illinois. The contract provided that, absent timely notice of termination by McKenzie, it would not end until the expiration date of any successor agreements.[3] The ALJ then found that a 1996 "Highway and Heavy" agreement between the Carpenters and the Associated General Contractors of Illinois was a successor agreement in effect when McKenzie hired its crew for the Crescent Bridge project, that this agreement encompassed the Crescent Bridge territory, and that some (but not all) of the work on the construction phase of the Crescent Bridge project fell within the occupational scope-of-work provisions of this agreement. The ALJ and the Board therefore concluded that this 1996 agreement obligated McKenzie to hire

---

[3]Unlike bargaining agreements with majority-status unions, § 8(f) pre-hire agreements may be unilaterally repudiated after they expire. However, the Board has held that an automatic renewal provision extends the life of a pre-hire agreement, thereby extending the duration of Deklawa's no-unilateral-repudiation rule, a holding we upheld in Cedar Valley Corp. v. NLRB, 977 F.2d 1211, 1219 (8th Cir. 1992), cert. denied, 508 U.S. 907 (1993).

members of Carpenters Local 166 for the Crescent Bridge project, and that McKenzie committed an unfair labor practice "by failing and refusing to honor its collective-bargaining contract" with the Carpenters. We disagree with the Board's construction of the contract.

First, we find nothing in the record supporting the ALJ's assumption that McKenzie was a member of the Associated General Contractors of Illinois bound by the 1996 agreement. McKenzie's name does not appear on a list of contractors appended to the agreement. No witness at the hearing was asked that question. And the ALJ stated in the fact section of his lengthy opinion (i) that McKenzie "has not delegated bargaining authority to any other association or individual to sign the Heavy and Highway Construction Agreement, and . . . has not signed that agreement"; and (ii) that the General Counsel made no showing that McKenzie had done any work in the territory covered by the 1988 agreement between 1988 and 1996. On this record, reviewing the 1988 and 1996 agreements *de novo*, we reject the Board's conclusion that the 1996 multi-party Highway and Heavy agreement was a successor to the one-page 1988 agreement.

Second, and perhaps more important, the Board's breach-of-contract analysis ignores the pre-hire nature of any contractual relationship between McKenzie and Local 166. The 1996 agreement contains very broad "occupational scope" provisions covering carpenters, millwrights, and piledrivers, crafts included within the Carpenters union. But the last paragraph of each scope-of-work provision states:

> The union agrees that the above occupational scopes are claims for jurisdictional purposes, and are not intended to conflict with established practices.

It is clear from this record that the IUOE also claims a broad array of work on marine construction projects. With an overlap established, the question is, what are the

employer's rights and obligations under its pre-hire agreements when assigning work that is within the jurisdictional claims of more than one craft union.

Robert McKenzie testified that he believed he had the right to assign all work on the construction phase of the Crescent Bridge project to members of one trade union, the IUOE. Testifying for McKenzie, the IUOE's Jack Schadt explained that, on smaller projects, affected craft unions and the contractor may agree on a "composite" crew, whose members work without regard to jurisdictional lines. Or the contractor may sign a "one-trade" agreement with one of the competing unions, as McKenzie and the IUOE did here, in which case that union may agree that the contractor may use members of other crafts in the one-trade crew. For larger projects, unless the parties agree upon a composite crew, "the workers from the various trades would perform the work of their respective trades and not cross jurisdictional lines." Mr. Schadt was then asked on cross examination by the Carpenters' attorney:

> Q: Now, if you went, I know I'm asking a hypothetical, if you went to a job and the contractor had a contract with the Carpenters, and a contract with the Operating Engineers, is it the contractor who would determine what work the individuals would be assigned or are there traditional areas that determine who does the work?
>
> A: Regardless of traditional assignment the contractor can make an assignment of work.

Neither the General Counsel nor the Carpenters offered any testimony rebutting Mr. Schadt's description of this custom and practice in the industry. Indeed, other parts of the record support Schadt's testimony. The Carpenters' own internal document regarding inter-union procedures for resolving jurisdictional disputes states that the process begins with "[a]n assignment of work by the contractor responsible for its performance," and further provides that the contractor's work assignment will "continue . . . without change unless there is an agreement between the contending

trades or the Administrator issues a directive or a job decision." The record also includes pre-hire agreements between McKenzie and Carpenters locals in Iowa that contain provisions for resolving jurisdictional disputes. Those agreements expressly recognize the employer's right to initially assign the work.

The 1996 Highway and Heavy agreement made no reference to this work-assignment issue, other than to except "jurisdictional disputes" from the agreement's grievance and arbitration remedies. The 1996 agreement is worded as though the Carpenters already represented a majority of McKenzie's employees. But it was admittedly a § 8(f) pre-hire agreement, and it would violate the NLRA principle of employee majority rule to construe it as conferring on the Carpenters the exclusive rights of a majority-status union. Thus, we have a pre-hire, work-assignment issue the answer to which cannot be found in the four corners of the 1996 Highway and Heavy agreement. The proper method of resolving such issues under the federal labor laws is well settled. "Gaps [in collective bargaining agreements] may be left to be filled in by reference to the practices of the particular industry and of the various shops covered by the agreement." United Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 580 (1960); see Int'l Woodworkers v. Weyerhaeuser Co., 7 F.3d 133, 136 (8th Cir. 1993), cert. denied, 511 U.S. 1128 (1994). The Board applied this principle in ruling against McKenzie in McKenzie Engineering, 182 F.3d at 625-26) ("the NLRB properly looked beyond the four corners of the [collective bargaining] agreement to consider the parties' practice, usage, and custom regarding the agreement").

Here, on the other hand, the ALJ and the Board ignored McKenzie's undisputed evidence of custom and practice on the ground that, faced with the Carpenters' claim, Robert McKenzie sought out the IUOE and thus there was no legitimate jurisdictional dispute. But that justification is inadequate. In early 1997, McKenzie had an on-going pre-hire relationship with the IUOE and already had IUOE members working on the demolition phase of the Crescent Bridge project. If

McKenzie's pre-hire agreement with Carpenters Local 166 reserved the right to assign the construction-phase work of this project to a competing union, the IUOE was clearly a legitimate competitor. No jurisdictional dispute resulted because, when McKenzie made the assignment, Local 166 chose to file a § 8(a)(5) unfair labor practice charge, rather than invoke the inter-union dispute resolution procedures or trigger the Board's authority to resolve jurisdictional disputes under NLRA § 10(k).[4]

In these circumstances, given the failure of the General Counsel and the Carpenters to rebut Mr. Schadt's uncontradicted testimony as to the relevant custom and practice, we reject the Board's conclusion that McKenzie committed the unfair labor practice of repudiating or breaching any pre-hire collective bargaining agreement it may have had with the Carpenters when it made a pre-hire assignment of the construction phase work under a one-trade agreement with the IUOE.

The Board's petition to enforce its order is denied.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.

_____

[4]For cases discussing procedures available to resolve jurisdictional disputes involving majority-status unions, see NLRB v. Radio & Television Broad. Eng'rs Union, Local 1212, 364 U.S. 573 (1961), and New Orleans Typographical Union No. 17 v. NLRB, 368 F.2d 755 (5th Cir. 1966).