# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos. 01-3602/4021

_____

| | | |
|---|---|---|
| McKenzie Engineering Company, | * | |
| | * | |
| Petitioner/Cross-Respondent, | * | On Petition for Review and |
| | * | Cross-Application for Enforcement |
| v. | * | of an Order of the National Labor |
| | * | Relations Board. |
| National Labor Relations Board, | * | |
| | * | |
| Respondent/Cross-Petitioner. | * | |

_____

Submitted: October 20, 2003
Filed: June 28, 2004

_____

Before MORRIS SHEPPARD ARNOLD, BOWMAN, and MURPHY, Circuit
Judges.

_____

BOWMAN, Circuit Judge.

In this labor case, the National Labor Relations Board (Board) has petitioned to enforce its make-whole order against McKenzie Engineering Company and McKenzie Engineering has appealed from that order. This is the fourth time we have waded into this dispute between McKenzie Engineering, certain union carpenters, and the National Labor Relations Board. See McKenzie Eng'g Co. v. NLRB, 303 F.3d 902 (8th Cir. 2002) (denying petition to enforce Board's order finding that McKenzie Engineering committed unfair labor practice by repudiating pre-hire agreement); Carpenters Fringe Benefit Funds v. McKenzie Eng'g Co., 217 F.3d 578 (8th Cir. 2000) (reversing district court judgment entered in favor of carpenter union in their

ERISA action for fringe-benefit contributions); <u>McKenzie Eng'g Co. v. NLRB</u>, 182 F.3d 622 (8th Cir. 1999) (granting enforcement of Board's order finding that McKenzie committed unfair labor practices and remanding for determination of remedy). In this petition to enforce its make-whole order and McKenzie's appeal from that order, the only issues are the extent of the back pay due to four discharged union carpenters (and their replacements) and what fringe benefits McKenzie owes the fired employees (and their replacements). We have jurisdiction under § 10(e) of the National Labor Relations Act ("the NLRA") (29 U.S.C. § 160(e) (2000)) and, for the reasons set forth below, grant enforcement of the order as it relates to the replacement workers, deny enforcement of the order as it relates to the wrongfully discharged employees, and remand the case to the Board for recalculation of the back-pay and fringe-benefit awards in a manner not inconsistent with this opinion.

In <u>McKenzie Engineering Company v. NLRB</u> ("<u>McKenzie I</u>"), 182 F.3d 622 (8th Cir. 1999), we upheld the Board's determination that McKenzie committed certain unfair labor practices under the NLRA. In particular, we upheld the Board's conclusion that McKenzie violated the NLRA in three respects when it: discharged four union carpenters in violation of §§ 8(a)(3) and (1) of the Act (29 U.S.C. §§ 158(a)(1), (3)); repudiated the union's collective bargaining agreement in violation of §§ 8(a)(1), (5); and discouraged other employees from joining the union by using economic coercion and took other coercive actions in violation of § 8(a)(1). <u>Id.</u> at 626–28. The Board's order contained a make-whole remedy and we determined that McKenzie's obligations to the discharged employees and their replacements should be determined during the compliance phase of the agency proceedings. <u>Id.</u> at 629. On remand, the parties disagreed as to the amount of back pay owed by the company and, following a hearing, the Board issued an order that found the wrongfully discharged employees would have continued to work for the company to the present day. Therefore, under the Board's order the company owes the four discharged employees back pay for the period from November 1995 until it rehires them. McKenzie also owes three of these employees fringe benefits from the time they were

fired until the collective bargaining agreement expired on April 30, 1997. Finally, the company owes back pay and fringe benefits to the non-union workers it hired to replace the fired workers in an amount equal to the difference between the union and non-union scale. The award for the non-union workers ends with the expiration of the collective bargaining agreement as well. In its appeal, McKenzie argues that our prior, related decisions bar a part of these back-pay and fringe-benefit awards because of the doctrines of claim and issue preclusion. McKenzie also urges that the award of back pay should be limited to thirty-one weeks (the length of McKenzie employees' average tenure) or that the award should end with the expiration of the collective bargaining agreement.

We review appeals from the NLRB with deference and will affirm a Board order or grant a petition to enforce an order if the Board has correctly applied the law and, on the record as a whole, there is sufficient evidence to support the order and findings. See Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Wright Elec., Inc. v. NLRB, 200 F.3d 1162, 1166 (8th Cir. 2000). We consider McKenzie's challenges to the order in turn.

McKenzie first urges that our decision in McKenzie Engineering Company v. NLRB, 303 F.3d 902 (8th Cir. 2002) ("the Crescent Bridge case") precludes part of the award issued by the National Labor Relations Board. Specifically, the company argues that because we denied enforcement of the Board's order in the Crescent Bridge case and concluded that a different carpenters' union could not claim any right to the work done on McKenzie's Crescent Bridge project, the Board is barred in this proceeding by the doctrines of claim and issue preclusion from awarding back pay to the fired employees (and their replacements) for work they otherwise would have done on the Crescent Bridge project. We disagree. The doctrine of issue preclusion holds that "once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." Allen v. McCurry, 449 U.S. 90, 94 (1980);

-3-

see also Tyus v. Schoemehl, 93 F.3d 449, 453 (8th Cir. 1996) (listing requirements for preclusion to apply), cert. denied, 520 U.S. 1166 (1997). For its part, the doctrine of claim preclusion prohibits a party to litigation from raising a claim or defense in a later proceeding that should have been raised in an earlier proceeding. See Rivet v. Regions Bank of La., 522 U.S. 470, 476 (1998). For at least two reasons, neither of these doctrines can be raised defensively in the manner that McKenzie urges. First, these res judicata doctrines cannot logically be raised as a defense against liability that was established by a decision in existence *prior* to the decision claimed to have preclusive effect. Such is the case here, where in McKenzie I we enforced a NLRB decision that the Company committed certain unfair labor practices and we remanded for a determination of what the remedy should be. McKenzie I established the Company's liability, and all that remained to be determined was the nature and extent of the remedy and not if there would be a remedy. Consequently, our later decision in the Crescent Bridge case cannot preclude the eventual award of back pay to employees where the illegality of the Company's conduct was already established even if the nature and extent of the remedy remained to be determined. Second, the Crescent Bridge case, which considered potential unfair labor practices *against a different union* and did not consider whether the four fired employees would have worked on the Crescent Bridge project, did not resolve any factual or legal questions that could preclude the award of back pay for work on that project. See Tyus, 93 F.3d at 453 (requiring identity of issue or fact for preclusion to apply). Accordingly, we reject this claim.

McKenzie also contends that our decision in Carpenters Fringe Benefit Funds v. McKenzie Engineering Company, 217 F.3d 578 (8th Cir. 2000) ("the ERISA case") has a similar preclusive effect with regard to the award of fringe benefits in the present case. Specifically, McKenzie urges that a portion of the current fringe-benefit award is precluded by our decision in the ERISA case that the carpenters union had not proved the existence of an obligation to make fringe-benefit contributions for work done on certain company projects. We conclude that an award in this case is

not precluded for the same reasons stated above.  In fact, we flagged this issue in the ERISA case and noted that:

> our decision rejecting the claim for contributions to the Funds is narrow. The NLRB has determined that McKenzie committed an unfair labor practice in firing four Local 410 carpenters from the Keokuk project. The Board's compliance proceedings, which are not yet complete, will no doubt result in a back pay award for those employees, and that award may well include pension benefit contributions to the Funds on their behalf.  Unlike the Funds' overbroad claim in this case, that type of award would clearly be consistent with McKenzie's contractual obligation to make contributions for work "covered by [the Local 410] Agreement."

Id. at 585 n.2.  Consequently, we reject McKenzie's preclusion claim.

McKenzie next claims that the length of the back-pay award for the discharged union workers is not supported by substantial evidence.[1]  Instead, McKenzie contends that the award either should be limited to the average length of its employees' tenure (thirty-one weeks) or should end with the expiration of Local 410's collective bargaining agreement on April 30, 1997.

We reject McKenzie's argument that the award should end with the expiration of thirty-one weeks.  As the ALJ noted, there is abundant evidence in the record to support the conclusion that the fired employees would (or could) have continued their employment with the company beyond thirty-one weeks.  For instance, the company president, Robert McKenzie, testified in the ERISA case that, if they had not been discharged, these fired employees would have continued to work on other company projects, which continued beyond the thirty-one-week limit proposed by the company.

---

[1]To the extent McKenzie argues to the contrary, we conclude that the entirety of the award for the replacement workers should be enforced.

-5-

McKenzie Eng'g Co., 336 N.L.R.B. 336, 337 (Sept. 28, 2001) (Supplemental Decision). Moreover, McKenzie stipulated to the reasonableness of the Board's method of computing back pay by using the amount of work done by the replacement workers. Thus, it is relevant that the replacement workers all were employed with the company for longer than thirty-one weeks and, in fact, two were the longest-serving employees listed in McKenzie's exhibit. There also is substantial evidence in the record to support the conclusion that workers such as the four at issue did have long-term employment relationships with several different employers over time. The record supports the conclusion that these employees may not work continuously for one employer and instead move from project to project, all the while consistently working for only a few employers. Thus, over time, employees, such as the four at hand, can achieve significant tenures with any one employer. Indeed, the specifics of the present case demonstrate this for, by Robert McKenzie's own admission, Mark Spiekermeier worked for the company for twenty-two months over a four-year period prior to being fired illegally. NLRB Compliance Tr. at 190–91; see also id. at 145 (testimony of Mark Spiekermeier that he worked for McKenzie "off and on for four years" prior to being fired). Further, there was evidence that, after they were fired, the three still-living employees each worked for a single employer in excess of the thirty-one weeks proposed as a limit by the company. For his part, Donald Patterson worked for the Des Moines County Historical Society starting in December of 1996 and worked for them regularly from the third quarter of 1997 until the record ends in September of 2000. App. at 192–93. Fred Arnold had a similar long-term relationship with Allied Construction, where he worked a total of 90 weeks between 1996 and the end of the record in 2000. App. at 195–245. Mark Spiekermeier also worked for Allied Construction for some 110 or more weeks before the record ends. App. at 246–97. Accordingly, we must reject the company's claim that the award be limited to thirty-one weeks.[2]

---

[2]In addition, McKenzie's claim to a thirty-one-week limit must be rejected because the document purporting to demonstrate that McKenzie's employees worked

We also reject McKenzie's claim that the back-pay award for the discharged union workers should end with the expiration of the collective bargaining agreement on April 30, 1997. In support of this argument, the company maintains that the fired employees were union members, did not accept non-union work after being fired, and would not have accepted non-union work from McKenzie after the collective bargaining agreement expired. As we already noted, all of the replacement workers worked on at least some of the subsequent McKenzie projects, whether "union" or not. Moreover, certain of these replacement workers gained union membership, obtained waivers from the union whose members ordinarily would have worked these jobs, and/or joined a second union. Thus, the expiration of the collective bargaining agreement had little impact on the replacement workers, whose experiences are an important measure of the back pay owed under the parties' stipulation. Finally, whatever remaining uncertainty exists regarding whether—in the absence of the company's bad acts—the collective bargaining agreement would have been renewed or the fired workers would have worked on McKenzie's subsequent, non-union projects is to be resolved against the company. NLRB v. Madison Courier, Inc., 472 F.2d 1307, 1321 (D.C. Cir. 1972). Therefore, we reject McKenzie's effort to limit the award to the time of the collective bargaining agreement's expiration.

Nevertheless, we conclude that the Board's order, which assumes that each of the three still-living employees would have worked full-time for McKenzie until the present day, is not supported by substantial evidence. In fact, the assumptions underlying the Board's calculations reveal that the award cannot possibly be proper

only thirty-one weeks on average suffers from certain defects. First, the document covers only the period from 1995–2000 and thus does not include employees such as Mark Spiekermeier in the average (we have already noted that Spiekermeir worked for McKenzie far in excess of thirty-one weeks between 1991–1995). Besides being incomplete temporally, the company's list is incomplete in that it omits employees who were members of other, competing unions. We therefore conclude that the ALJ properly discounted the company's calculation of its employees' average tenure.

for there is no evidence that any non-supervisory employee has ever worked continuously for McKenzie for as long as the now 400-plus weeks that the Board's order assumes. The assumption, therefore, that each of these employees would have had a record-setting tenure with the company is unwarranted. The assumption is also unwarranted because, as the company points out, none of these employees has held a single job for anywhere near this length of time in past years. Thus, the Board's award does not tend to set the wronged workers in, as nearly as possible, the situation they would have been in if the company had not acted wrongly. Phelps Dodge Corp. v. NLRB, 313 U.S. 177, 194 (1941). Rather, this speculative award is a windfall for the employees and is unduly punitive to the employer insofar as it is based on assumptions supported by neither McKenzie's past history as an employer, nor these workers' past employment histories. Local 60, United Bhd. of Carpenters v. NLRB, 365 U.S. 651, 655 (1961) (noting Board's authority is remedial, not punitive). We may modify a Board order that goes beyond the remedial powers granted by the NLRA. NLRB v. J.S. Alberici Constr. Co., 591 F.2d 463, 470 n.8 (8th Cir. 1979).

Although there is not substantial evidence to support the extent of the Board's award, there is evidence to support the conclusion that each of the fired employees would have worked for McKenzie for substantial lengths of time had they not been fired. We already have noted that the record reveals that employees such as the ones McKenzie illegally discharged do have long-term employment relationships with several different employers and can, over time, achieve significant tenures with any one employer. Ante at 6. We conclude that the record will support an award of back pay based on the amount of time the employees spent working for the employer with whom they had the longest tenure following their dismissal. For example, the record reveals that Donald Patterson worked for the Des Moines Historical Society for 169 weeks out of the 255 possible weeks between his dismissal (November 1, 1996) and the end of the third quarter of 2000. Based on this work record, Patterson should receive back pay (and fringe benefits until April 30, 1997) for sixty-six percent of the time (169 divided by 255) expended by McKenzie on subsequent projects until

McKenzie offers him reemployment. On remand, the Board shall take additional evidence on the fired employees' work histories and issue a back-pay award that is not inconsistent with this opinion. An award that follows our suggested formula will be based more strictly on the work histories of the discharged employees (which appear to reflect the McKenzie labor pool as a whole) and will be more precisely "tailored to expunge only the *actual*, and not merely *speculative*, consequences of the unfair labor practices." Sure-Tan, Inc. v. NLRB, 467 U.S. 883, 900 (1984) (emphasis in original).[3] An award calculated in accordance with our suggested formulation also more precisely fulfills § 10(c)'s goal of making these employees whole and restoring the situation to that which would have occurred but for McKenzie's unfair labor practices. 29 U.S.C. § 160(c); Phelps Dodge Corp., 313 U.S. at 194.

For the foregoing reasons, the petition to enforce the order of the Board is granted as to the replacement workers and denied as to the wrongfully discharged union employees. The case is remanded to the Board for recalculation of the extent

---

[3]Our imposition of this back-pay formula is consistent with our recognition that the Board's power "to award back pay 'is a broad discretionary one, subject to limited judicial review.'" Woodline Motor Freight, Inc. v. NLRB, 972 F.2d 222, 225 (8th Cir. 1992) (quoting NLRB v. Rutter-Rex Mfg. Co., 396 U.S. 258, 262–63 (1969)). We are also cognizant that "[i]n many instances, it is impossible to precisely determine the amount of backpay that should be awarded. 'In such circumstances the Board may use as close approximations as possible, and may adopt formulas reasonably designed to produce such approximations.'" Id. (quoting NLRB v. Brown & Root, Inc., 311 F.2d 447, 452 (8th Cir. 1963)). The Board applies three basic formulas to compute back pay, but recognizes that "there is no fixed method for calculating back pay." NLRB Casehandling Manual, Pt. III–Compliance Proceedings § 10532.1. In this case, we merely determine that the record will not support an award of back pay that is based on the assumption that the discharged employees would have worked on every subsequent McKenzie project, no matter where that project was located, especially where the illegally discharged employees' work history suggests otherwise.

of the back-pay and fringe-benefit awards with respect to the wrongfully discharged union employees in a manner that is not inconsistent with this opinion.

_____