# United States Court of Appeals

## For the Eighth Circuit

———————————————

No. 15-1302
No. 15-2039

———————————————

National Labor Relations Board

*Petitioner/Cross-Respondent*

International Union of Operating Engineers, Local 150, AFL-CIO

*Intervenor*

v.

Seedorff Masonry, Inc.

*Respondent/Cross-Petitioner*

——————————

Submitted: September 21, 2015
Filed: February 10, 2016

——————————

Before LOKEN, BENTON, and SHEPHERD, Circuit Judges.

——————————

LOKEN, Circuit Judge.

On September 7, 2012, with an arbitrator selected to hear a pending grievance, Local 150 of the International Union of Operating Engineers ("Local 150") filed an unfair labor practice charge, alleging that Seedorff Masonry, Inc. ("Seedorff"), a masonry contractor based in Strawberry Point, Iowa, violated the National Labor Relations Act ("NLRA") "by repudiating the parties' collective bargaining

agreement" ("CBA"). The National Labor Relations Board's General Counsel filed a Complaint alleging that Seedorff had violated NLRA §§ 8(a)(1) and (5), 29 U.S.C. §§ 158(a)(1), (5), by repudiating a CBA between the Quad Cities Builders Association ("QCBA") and Local 150 to which Seedorff had agreed to be bound.

After an evidentiary hearing, the Board's Administrative Law Judge ("ALJ") ruled that Seedorff violated §§ 8(a)(1) and (5) by repudiating a valid pre-hire CBA with Local 150 and by failing "to abide by the hiring hall and benefit provisions of the contract." The ALJ rejected as largely irrelevant Seedorff's claim that its actions were a lawful response to a jurisdictional dispute between Local 150 and the Laborers' International Union of North America ("the Laborers") over whether Seedorff was properly assigning masonry work that fell within the overlapping coverages of the two unions' pre-hire CBAs to members of the Laborers. The Board affirmed the ALJ's analysis and issued a Decision and Order requiring Seedorff to pay Local 150's members "for any loss of earnings and other benefits suffered as a result of [Seedorff's] failure to honor" its CBA with Local 150. Seedorff Masonry, Inc., 360 N.L.R.B. No. 107, at *2 (2014). At oral argument, counsel for the Board confirmed that this back pay remedy could include work that had been performed by Laborers consistent with that union's CBA. The Board petitions to enforce its Decision and Order. Seedorff cross-petitions to review and vacate the Order. Local 150 has intervened in support of the Board. Concluding that the Board's analysis was contrary to the NLRA and pre-hire CBAs as construed in prior judicial decisions and the Board's own precedent, we deny enforcement and vacate the Decision and Order.

## I. Background.

**A. Section 8(f) Pre-Hire Agreements.** Based on established practice in the construction industry, Congress enacted § 8(f) of the NLRA to modify the rule that an employer may not enter into a CBA with a union that does not represent a majority of the employees in the bargaining unit. See 29 U.S.C. § 159(a); McKenzie Eng'g

Co. v. NLRB, 303 F.3d 902, 906 (8th Cir. 2002). Section 8(f) "allows construction industry employers and unions to enter into agreements setting the terms and conditions of employment for the workers hired by the signatory employer without the union's majority status first having been established in the manner provided for under § 9 of the Act." Jim McNeff, Inc. v. Todd, 461 U.S. 260, 266 (1983).

For many years, the Board held that a construction industry employer could unilaterally repudiate a § 8(f) pre-hire agreement any time before the union attained majority status. However, the Board overturned this rule in John Deklewa & Sons, Inc.[1] Under Deklewa, § 8(f) agreements are "binding, enforceable, and not subject to unilateral repudiation" throughout their term. 275 N.L.R.B. at 1389. We expressly upheld the Deklewa rule in NLRB v. W.L. Miller Co., 871 F.2d 745, 747-48 (8th Cir. 1989). Although the rule provides that neither party may be compelled to negotiate a successor agreement after expiration of a § 8(f) agreement, the Board has ruled that an automatic renewal provision in a § 8(f) agreement extends the no-unilateral-repudiation rule, a holding we upheld in Cedar Valley Corp. v. NLRB, 977 F.2d 1211, 1219 (8th Cir. 1992), cert. denied, 508 U.S. 907 (1993).

Under Deklewa, an employer's unilateral repudiation of a § 8(f) agreement before its expiration violates the employer's § 8(a)(5) duty to bargain, just as repudiation of a CBA with a majority-status union has long been held to violate § 8(a)(5).[2] McKenzie Eng'g, 303 F.3d at 908. However, the Board has carved a

---

[1]282 N.L.R.B. 1375, 1389 (1987), enforced sub nom. Int'l Ass'n of Bridge Workers, Local 3 v. NLRB, 843 F.2d 770 (3d Cir.), cert. denied, 488 U.S. 889 (1988).

[2]§ 8(a)(5) cryptically provides: "It shall be an unfair labor practice for an employer . . . to refuse to bargain collectively with the representatives of his employees, subject to the provisions of [§ 9(a)]." 29 U.S.C. § 158(a)(5).

"single-employee unit" exception to its no-unilateral-repudiation rule for § 8(f) CBAs which is critical in this case:

> [W]hen a unit consists of no more than a single permanent employee at all material times, an employer has no statutory duty to bargain and thus, will not be found in violation of the Act for disavowing a bargaining agreement and refusing to bargain.

Haas Garage Door Co., 308 N.L.R.B. 1186, 1187 (1992). The Board has explained that this exception is based on a fundamental tenet of the NLRA: "[T]he principle of collective bargaining presupposes that there is more than one eligible person who desires to bargain. The Act therefore does not empower the Board to certify a one-man unit." Foreign Car Ctr., Inc., 129 N.L.R.B. 319, 320 (1960); see Stack Elec., Inc., 290 N.L.R.B. 575, 577 (1988).

**B. The Union/Employer Relationships at Issue.** Seedorff is a union contractor with an office in the Quad-Cities area that seasonally employs "between ten and thirty Bricklayers all of the time, and ten to thirty Laborers all of the time." Seedorff's President, Robert Marsh, testified that Seedorff as a masonry subcontractor only enters into § 8(f) pre-hire CBAs; it has § 8(f) CBAs with the Laborers Union and the Bricklayers Union. The administrative hearing record includes a multi-employer § 8(f) agreement with the Laborers, to which Seedorff was a party; a § 8(f) agreement between Seedorff and Operators Local 234; a multi-union § 8(f) Project Labor Agreement ("PLA") governing construction of a state prison in Iowa, to which Local 150 and Seedorff were parties; and the QCBA agreement here at issue.

In June 1988, the multi-employer QCBA and its contractor members entered into a Building Agreement with Local 150's predecessor in which each contractor recognized Local 150 as the sole collective bargaining agent for employees engaged in construction work covered by the agreement. Though not a member of QCBA,

Seedorff signed an individual Building Agreement in July 1988 agreeing that it "hereby becomes a signatory employer" and further reciting:

> [Seedorff] who is not a member of the [QCBA] agrees to be bound by any amendments, extensions, or changes in this Agreement agreed to by the Union and the [QCBA], and further agrees to be bound by the terms and conditions of all subsequent contracts negotiated between the Union and the [QCBA] unless ninety (90) days prior to the expiration of this or any subsequent agreement [Seedorff] notifies the Union in writing that it revokes such authorization.

After 1988, the QCBA and Local 150 entered into ten successor agreements, including the one at issue, which was effective from June 1, 2010, to May 31, 2014 (the "2010 QC Agreement"). Although not apparent from its terms (at least not to us), it is undisputed that the 2010 QC Agreement was, as to Seedorff, a § 8(f) pre-hire agreement. It is also undisputed that Seedorff never gave Local 150 timely ninety-day notice revoking QCBA's authority to bind Seedorff to the 2010 QC Agreement.

The record contains little evidence of relations between Seedorff and Local 150 from 1988 until Seedorff and Local 150 entered into the Iowa prison PLA in the spring of 2010. Marsh testified, based on his personal knowledge and review of Seedorff's payroll records, that Seedorff continuously worked in Local 150's jurisdictional territory but only one Operator was ever employed by Seedorff after Marsh was hired in 2006, a member of Operators Local 234 who worked on a project in Local 150's territory for three months in 2009, causing Seedorff to make payments to Local 150's benefit funds. On cross examination, Marsh recalled that 1993 payroll records showed that Seedorff then employed a Local 150 member who had retired in 2003. Neither the General Counsel nor Local 150, whose records would doubtless show such information, introduced evidence that Seedorff employed any other Local 150 Operator. In 2011, Local 150 requested that Seedorff sign an agreement that

appears to be a majority-status CBA between Local 150 and a different multi-employer bargaining association.  Seedorff declined.

**C. The Work Dispute at Issue.**  Marsh testified that Seedorff has historically and contractually assigned the work of "mason tending" to members of the Laborers Union for the last 55 years.  Mason tending encompasses a variety of tasks, and it includes "conveying of all materials used by Masons by any mode or method."  In 2011, Local 150 challenged Seedorff's work assignments under its § 8(f) CBA with the Laborers.  This was hardly a surprising development.  As the Seventh Circuit noted some years earlier, "[t]he Laborers and Operators were fierce rivals for mason-tending forklift work on construction projects," resulting in "substantial litigation before the NLRB."  Hutter Constr. Co. v. IUOE, Local 139, 862 F.2d 641, 642 n.7 (7th Cir. 1988).

In July 2011, Local 150 filed a grievance claiming that Seedorff violated its § 8(f) PLA with Local 150 by assigning Laborers to operate forklifts at the Iowa prison project.  An arbitrator dismissed the grievance, concluding that Seedorff had properly assigned the forklift work to the Laborers.  Changing tactics, Local 150 filed two new grievances in October, claiming that Seedorff had violated the 2010 QC Agreement, first, by assigning a Laborer to operate a "boom truck" at a project in Burlington, Iowa, and second, by assigning equipment maintenance work to Laborers at the Iowa prison project.  In both grievances, commonly referred to as "pay-in-lieu" grievances, Local 150 demanded "back wages and fringe benefits lost by all affected members of the bargaining unit [established by the 2010 QC Agreement] who would be working had you honored our Agreement."

Seedorff declined to pay the demanded amounts.  On November 3, Marsh sent Local 150 an email inquiry:

> To my knowledge, Seedorff Masonry, Inc. is not a signatory to the [2010] Quad City Agreement . . . . If you disagree, please identify the document(s) upon which you are relying. We will need this information to be able to address your grievances further.

Within hours, Local 150 sent Seedorff a memorandum and correspondence "pertaining to the QC Building Agreement," which are not part of the administrative record. The parties then proceeded through the Agreement's grievance procedures, ultimately selecting an arbitrator and setting possible dates for an arbitration hearing to resolve both grievances in the spring of 2012.

**D. Seedorff Seeks Relief from the Board.** The NLRA provides that it is an unfair labor practice for a union to coerce an employer "to assign particular work to employees in a particular labor organization . . . rather than to employees in another labor organization." 29 U.S.C. § 158(b)(4)(D). When an employer charges a union with violating § 8(b)(4)(D), § 10(k) authorizes the Board "to hear and determine the dispute out of which such unfair labor practice shall have arisen." Usually, the dispute involves competing claims to work by two unions; often, both have "legitimate contractual claims." Local 30, United Slate Workers v. NLRB, 1 F.3d 1419, 1428 (3d Cir. 1993). In resolving the § 10(k) dispute by awarding the work to one of the competing unions, the Board looks "beyond the four corners of the [CBA] to consider the parties' practice, usage, and custom regarding the agreement." McKenzie Eng'g Co. v. NLRB, 182 F.3d 622, 625-26 (8th Cir. 1999).

On January 3, 2012, Seedorff wrote the Great Plains Laborers' District Council, advising that Local 150 was pressuring Seedorff to reassign the operation and maintenance of equipment used to transport masonry materials to the operating engineers and giving notice that Seedorff "is considering the reassignment of this work." On January 31, Seedorff filed an unfair labor practice charge against the Laborers, alleging that Seedorff's past practice was to assign the work of transporting masonry material to the Laborers, Local 150 was pressuring Seedorff to reassign the

-7-

work, and the Laborers "have threatened to strike and picket" work sites if Seedorff reassigned the work.  In late February, the Board's Regional Director dismissed the charge without a hearing, explaining in one paragraph of a letter to Seedorff's counsel that the PLA provided a method to resolve the Iowa prison site dispute  and "there are no competing claims for the same work" at the Burlington project.[3]

**E. Seedorff Provokes This Proceeding.**  Denied a remedy by the Board, Seedorff was left with its contractual remedies and obligations.[4]  With an arbitrator selected to hear Local 150's grievances, counsel for Seedorff wrote Local 150's counsel "to discuss settlement" of the PLA and Burlington grievances.  Regarding the PLA grievance, Seedorff noted the prior favorable arbitration ruling, predicted "the arbitrator would rule similarly in the case at hand," and offered to settle the grievance

---

[3]The latter, unexplained ruling is, in a word, inexplicable.  Under the 2010 QC Agreement, Local 150 claimed the "operation and maintenance of . . . any [] power machine that may be used by [Seedorff] for the construction, alteration, repair or wrecking of a building."  Under its § 8(f) CBA with Seedorff, the Laborers claimed "conveying of all materials used by Masons by any mode or method."

In the months before and after the Board's decision in this case, the Board held § 10(k) hearings to resolve similar disputes between other Operators and Laborers local unions, concluding there were competing claims -- the Operators' pay-in-lieu grievances, and the Laborers' threats to strike if the work was reassigned -- and awarding the disputed work to the Laborers.  Laborers Local 310 (KMU Trucking), 361 N.L.R.B. No. 37 (Sept. 3, 2014);  Laborers Local 894 (Donley's, Inc.), 360 N.L.R.B. No. 20 (Jan. 10, 2014).  The merits of the Regional Director's ruling are not at issue.  What is troubling is the ALJ's treatment of the no-competing-claims issue as resolved by the Regional Director's ruling despite overwhelming evidence of competing claims in the hearing record.

[4]Grievance/arbitration contractual remedies subject to judicial review under § 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185(a), and § 10(k) decisions by the Board, are alternative methods for resolving jurisdictional work assignment disputes.  Carey v. Westinghouse Elec. Corp., 375 U.S. 261, 266 (1964).

by paying $846.40 to the Local 150 Assistance Fund. Regarding the Burlington grievance, to which the PLA did not apply, Seedorff asserted there was no basis for the grievance because "no collective bargaining agreement currently exists between Seedorff and Local 150," and "therefore request[ed] that Local 150 withdraw the Burlington grievance." On September 7, Local 150 filed this unfair labor practice charge alleging that the April 12 letter "violated the Act by repudiating the parties' collective bargaining agreement."

## II. Discussion.

The ALJ and the Board first ruled that Seedorff was bound by the 2010 QC Agreement prior to sending Local 150 the April 12 letter. Substantial evidence supports this ruling. See NLRB v. Whitesell Corp., 638 F.3d 883, 890 (8th Cir. 2011) (standard of review). In July 1988, Seedorff agreed to be bound to the then-existing Quad Cities Agreement and to "all subsequent contracts negotiated between" Local 150 and the QCBA. Seedorff concedes it did not timely revoke QBCA's authorization to bargain the 2010 QC Agreement in the manner prescribed. In Cedar Valley, we enforced the Board's order that an employer was bound by a subsequent § 8(f) pre-hire agreement in virtually identical circumstances. 977 F.2d at 1220; accord Local 257, IBEW v. Grimm, 786 F.2d 342, 346 (8th Cir. 1986).

In the April 12 letter, Seedorff asserted that, after July 1988, it "consistently has informed Local 150 that it has not assigned its bargaining rights to the [QCBA] and has not agreed to a [CBA] with Local 150." Assuming without deciding that such conduct would distinguish our decision in Cedar Valley, Seedorff presented no evidence supporting this assertion at the administrative hearing. Rather, Seedorff argued that Local 150 itself terminated a prior Quad Cities agreement with a March 2006 letter to the QCBA asking to "start negotiations leading to a new agreement." The ALJ's finding that this letter served only as notice to start negotiation of a successor agreement, not as notice to terminate the existing agreement, was well

supported by the hearing record, including QCBA's response to Local 150. Moreover, even if the 2006 letter had terminated the then-existing Quad Cities agreement, we fail to see how that would have affected QCBA's authority to bind Seedorff to the successor 2010 QC Agreement. See Cedar Valley, 977 F.2d at 1220 ("[T]he decisive issue is whether [the employer] affirmatively, and in compliance with the terms of the 1978 agreements, revoked [the association's] authority to bind it to successive agreements.").

The ALJ and the Board went on to conclude: (A) that the April 12, 2012, letter was a "clear and unequivocal" repudiation of the 2010 QC Agreement; (B) that the repudiation charge filed by Local 150 was not time-barred by the six-month statute of limitations in § 10(b) of the NLRA; and (C) that Seedorff failed to prove its single-employee unit "affirmative defense." We conclude that each of these rulings was legally flawed.

**A. The Repudiation Issue.** After concluding that Seedorff was bound by the 2010 QC Agreement, the ALJ stated, "I further find that [Seedorff] violated Section 8(a)(5) and (1) of the Act[5] by failing to abide by the terms of the agreement and by repudiating its collective-bargaining relationship with [Local 150]." The "failing to abide" finding was a reference to Seedorff assigning to the Laborers work that fell within the broad classes of construction work covered by the 2010 QC Agreement, an issue not raised in Local 150's charge for obvious reasons, as we will later explain. Neither the ALJ nor the Board discussed why Seedorff's statement in the April 12 letter, "Thus, no collective bargaining agreement currently exists between Seedorff and Local 150, and there is no basis for Local 150's Burlington grievance,"

_____

[5] "A violation of Section 8(a)(5) of the Act produces a derivative violation of Section 8(a)(1) by interfering with the collective bargaining rights of employees." St. John's Mercy Health Sys. v. NLRB, 436 F.3d 843, 846 n.5 (8th Cir. 2006) (quotation omitted). Here, the parties focus exclusively on § 8(a)(5) issues.

-10-

constituted a refusal-to-bargain repudiation. The Supreme Court explicitly cautioned in Jim McNeff, 461 U.S. at 270 n.11, that context matters in deciding "what specific acts would affect the repudiation of a prehire agreement." Because "[a]rbitrators and courts are still the principal sources of contract interpretation," and repudiation is a question of contract interpretation, we review this issue *de novo*. Litton Fin. Printing Div. v. NLRB, 501 U.S. 190, 202-03 (1991).

When Seedorff wrote the April 12 letter, it had been denied a § 10(k) remedy by the Board and was facing an arbitration hearing on Local 150's grievances. As relevant here, Seedorff had three arbitration defenses -- that it was not bound by the 2010 QC Agreement; that it could unilaterally repudiate a § 8(f) CBA that purported to cover a single-employee unit; and that it had properly assigned work covered under the two overlapping § 8(f) CBAs to the Laborers. The first two defenses challenged whether there was a CBA for the arbitrator to enforce. Those questions of arbitrability are for a court to decide, not the arbitrator, unless the parties agree otherwise. See AT & T Techs., Inc. v. Commc'ns Workers of Am., 475 U.S. 643, 648-49 (1986). If those defenses failed, the third issue, whether Seedorff had properly assigned the work, was unquestionably for the arbitrator. See id. at 650 ("[T]hat the employer has violated the [CBA] is to be decided, not by the court asked to order arbitration, but as the parties have agreed, by the arbitrator.").

After receiving the April 12 letter, Local 150 had various procedural options to resolve the jurisdictional contract dispute. It could inquire whether Seedorff agreed that the arbitrator would decide arbitrability, in which case the parties would schedule the arbitration hearing. It could ask the arbitrator to schedule the hearing, leaving Seedorff the option to file a § 301 suit to enjoin arbitration. It could file a § 301 suit to compel arbitration. Or Local 150 and Seedorff could petition the Board to reconsider the competing claims issue and conduct a § 10(k) hearing. Local 150 invoked none of these available remedies. Instead, it filed this § 8(a)(5) repudiation charge, a procedure that effectively excluded the competing Laborers Union.

-11-

In these circumstances, the Board could not decide the contract repudiation issue without considering the context of the April 12 letter. The letter did not refuse to bargain any issue, the explicit focus of § 8(a)(5). Rather, Seedorff asserted there was "no basis" for the breach of contract Local 150 alleged in the Burlington pay-in-lieu grievance. Seedorff also offered to settle the Iowa prison work assignment grievance; Local 150 had framed that grievance as a breach of the 2010 QC Agreement, but Seedorff argued it would be controlled by prior arbitration under the PLA. The ALJ and the Board failed to explain why the April 12 letter, *standing alone and in context*, was a repudiation of the § 8(f) 2010 QC Agreement. "[M]ere noncompliance with the contract does not in itself suffice to establish repudiation." Grimm, 786 F.2d at 346.

**B. The § 10(b) Statute of Limitations Issue.** Section 10(b) of the NLRA provides: "[N]o complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board." 29 U.S.C. § 160(b). The six-month limitation period begins to run when the charging party receives "clear and unequivocal notice that the unfair labor practice had occurred." NLRB v. La-Z-Boy Midwest, 390 F.3d 1054, 1061 n.1 (8th Cir. 2004). "[A] repudiation need not be an express, written repudiation but instead can be manifested in a variety of ways." NLRB v. Jerry Durham Drywall, 974 F.2d 1000, 1004 (8th Cir. 1992). Seedorff has the burden to establish this defense by proving that Local 150 was put on notice more than six months before its September 2012 charge that Seedorff had repudiated the 2010 QC Agreement. See id. (collecting Board cases); AMCAR Div., ACF Indus., Inc. v. NLRB, 596 F.2d 1344, 1351-52 (8th Cir. 1979).

The ALJ found that Local 150's charge was timely because Seedorff's communications relating to the work assignment disputes in 2011 and 2012 were equivocal and therefore the April 2012 letter was the first clear and unequivocal notice of repudiation Local 150 received. The ALJ also found, elsewhere in the opinion, that Seedorff breached the 2010 QC Agreement by "using Laborers to

perform union work." Numerous Board and court decisions establish that a valid § 8(f) CBA may be repudiated by "open and notorious acts by one party, known to the other, which are inconsistent with the continuance of the contract." Contractors Health & Welfare Plan v. Harkins Constr. & Equip. Co., 733 F.2d 1321, 1326 (8th Cir. 1984) (remanding a § 301 case for a finding on this issue); see Laborers Health & Welfare Tr. Fund v. Westlake Dev., 53 F.3d 979, 982-83 (9th Cir. 1995); In re CAB Assocs., 340 N.L.R.B. 1391, 1392 (2003).

From the inception of the 2010 QC Agreement, Seedorff did not hire *any* Local 150 member for work that Local 150 contends was covered by that agreement, nor did Seedorff make contributions to the Operators benefit funds that hiring Local 150 members would have required. This conduct, known to Local 150 no later than its filing of the October 2011 grievances, appears to have been "open and notorious acts . . . inconsistent with the continuance of the contract." Yet the ALJ did not consider whether Seedorff had repudiated the 2010 QC Agreement by conduct well before its April 2012 letter, and the Board did not address the issue. If there was repudiation by conduct before March 2012, the Board would have been compelled to dismiss the General Counsel's complaint. See St. Barnabas Med. Ctr., 343 N.L.R.B. 1125, 1127 (2004) ("[I]f the repudiation occurred outside the 10(b) period, all subsequent failures . . . to honor the terms of the [CBA] are deemed consequences of the initial repudiation for which the union may not recover.").

**C. The Single-Employee Unit Issue.** Seedorff argues that it *lawfully* repudiated the 2010 QC Agreement because the Board recognizes that an employer may unilaterally repudiate a § 8(f) CBA during its term if the union has not achieved majority status. We join the Seventh Circuit in recognizing the single-employee unit exception in the § 8(f) context. See J.W. Peters, Inc. v. Bridge Workers, Local 1, 398 F.3d 967, 973-75 (7th Cir. 2005); accord Westlake Dev., 53 F.3d at 982-83. Because employment fluctuates greatly in the construction industry, a § 8(f) bargaining unit may fall to fewer than two employees with some frequency. See Jim McNeff, 461

-13-

U.S. at 266. Therefore, for the exception to apply, the Board "require[s] proof that the purportedly single-employee unit is a stable one, not merely a temporary occurrence." McDaniel Elec., 313 N.L.R.B. 126, 127 (1993).

Here, Marsh, Seedorff's President, testified that Seedorff had not employed a Local 150 member since 2003 and had employed only one member of Operators Local 234 when he worked briefly in Local 150's territory in 2009. In rejecting the single-employee unit defense, the ALJ first held that Seedorff had failed to meet its burden of proof on this affirmative defense because Seedorff failed to introduce payroll records supporting Marsh's "conclusory testimony." This ruling was an error of law. The single-employee unit exception is a defense that an employer must invoke. But the exception is based on the principle that the NLRA does not empower the Board to certify a one-man unit. Therefore, when the defense is properly invoked, the Board has recognized that a § 8(a)(5) unfair labor practice charge must be dismissed if "the General Counsel has *failed to establish*" that the appropriate bargaining unit consisted of more than one employee during the time in question. D & B Masonry, 275 N.L.R.B. 1403, 1409 (1985) (emphasis added), followed in Stack Elec., 290 N.L.R.B. at 577-78. We have carefully reviewed the Board cases cited by the ALJ; none support her ruling reversing these contrary burden-of-proof rulings. Marsh's testimony was clearly sufficient to require that the General Counsel submit evidence proving the absence of a single-employee unit. In summarily affirming the ALJ on this issue, the Board lost sight of the important distinction between an employer's burden of going forward with evidence establishing a prima facie case for the exception, and the General Counsel's ultimate burden of persuasion. See generally NLRB v. Mastro Plastics Corp., 354 F.2d 170, 176-78 (2d Cir. 1965).

The ALJ went on to conclude that Seedorff's single-employee unit defense failed because Seedorff "used Laborers to perform union work as defined in the QCBA agreement." This alternative holding is based on two more serious errors of law. First, the General Counsel's complaint alleged that the bargaining unit consisted

-14-

of "the employees described in Article 11" of the 2010 QC Agreement, which set forth wages and classifications for all Operators covered by the agreement. The General Counsel submitted no evidence supporting that allegation. The ALJ's ruling implicitly decided an issue which to our knowledge the Board has never addressed -- when an employer has entered into § 8(f) pre-hire CBAs that define overlapping work coverages, and the employer has validly assigned all the work to members of another union and claims the single-employee unit exception to its § 8(a)(5) duty to bargain with the charging party union, does the bargaining unit to which the exception applies include the second union's employees? In our view, the logical answer is no. But in any event, we will not enforce an order that simply refused to address the issue.

Second, the ALJ concluded (assumed would be more accurate) that Seedorff violated the 2010 QC Agreement by assigning work covered by that pre-hire CBA to members of the Laborers Union.[6] This ruling was contrary to the well-recognized principle that, when an employer has entered into § 8(f) CBAs with competing craft unions, the NLRB and § 301 courts look beyond the four corners of the CBAs to consider the parties' practice, usage, and custom in determining whether the employer violated the NLRA in assigning the work at issue. See McKenzie Eng'g, 303 F.3d at 908-10; Sheet Metal Workers Int'l Ass'n Local Union No. 27 v. E.P. Donnelly, Inc., 737 F.3d 879, 888 (3d Cir. 2013). Here, since the General Counsel declined to introduce evidence addressing the question, the record can only support the conclusion that Seedorff did not violate the 2010 QC Agreement by continuing its long-standing practice of assigning mason-tending work at the Burlington and Iowa prison projects to members of the Laborers Union. By refusing to resolve this issue, the Board entered an Order that may enrich Local 150's members for work they were not entitled to perform and may force Seedorff to pay for work that it already properly

---

[6]The ALJ also found that Seedorff "created this 'jurisdictional dispute' . . . when it attempted to assign union work to the Laborers," an assertion made by the Operators and rejected by the Board in KMU Trucking, 361 N.L.R.B. No. 37, at *3, and in Donley's, Inc., 360 N.L.R.B. No. 20, at *4.

paid Laborers to do.  This we will not enforce.  <u>McKenzie Eng'g</u>, 373 F.3d at 894 (NLRA remedy may not confer a "windfall" nor be "unduly punitive").

### III. Conclusion.

By refusing to acknowledge these issues and present evidence addressing them, the General Counsel and Local 150 as Charging Party failed to prove essential elements of the Complaint, as was true in <u>McKenzie Eng'g</u>, 303 F.3d at 911.  By ruling that these issues were irrelevant and failing to resolve them, the ALJ and the Board issued an unlawful Order that may not be enforced.  Accordingly, we deny the Board's Application for Enforcement, grant Seedorff's Cross Petition for Review, and vacate the Board's Decision and Order dated May 7, 2014.

_____