# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos. 98-3370/3713

_____

| | | |
|---|---|---|
| McKenzie Engineering Company, | * | |
| | * | |
| Petitioner/Cross-Respondent, | * | Petition to Review an Order |
| | * | of the National Labor |
| v. | * | Relations Board. |
| | * | |
| National Labor Relations Board, | * | |
| | * | |
| Respondent/Cross-Petitioner. | | |

_____

Submitted:  March 10, 1999

Filed:  June 25, 1999

_____

Before McMILLIAN and MORRIS SHEPPARD ARNOLD, Circuit Judges, and NANGLE,[1] District Judge.

_____

MORRIS SHEPPARD ARNOLD, Circuit Judge.

This case concerns a labor dispute between McKenzie Engineering Company and the United Brotherhood of Carpenters and Joiners of America, Local 410, AFL-CIO (the union).  The dispute arose during a project involving repairs to an icebreaker structure located on a dam in the Mississippi River near Keokuk, Iowa.  The union filed charges against McKenzie before the National Labor Relations Board

_____

[1]The Honorable John F. Nangle, United States District Judge for the Eastern District of Missouri, sitting by designation.

(NLRB), which subsequently found that McKenzie had engaged in unfair labor practices in violation of several provisions of the National Labor Relations Act (NLRA). *See* 29 U.S.C. § 158(a)(1), § 158(a)(3), § 158(a)(5). McKenzie petitions for reversal of the NLRB's decision and remedy order, and the NLRB cross-petitions for enforcement of its order. We deny McKenzie's petition for reversal and grant the NLRB's cross-petition for enforcement of its order.

I.

When McKenzie began work on the Keokuk dam project in May, 1995, it was a party to a "pre-hire" collective bargaining agreement with the union, *see* 29 U.S.C. § 158(f), that covered certain types of construction work in specific counties of Iowa and Missouri. The agreement required that McKenzie give the union the first opportunity to provide carpenters to perform work covered by the agreement, and recognized the union as the bargaining agent for those carpenters. In May and June, 1995, McKenzie hired four union carpenters to work on the Keokuk dam project. In November, McKenzie fired the union carpenters and replaced them with non-union workers. For the remainder of the project, McKenzie continued to employ non-union workers to perform the work previously done by the union carpenters, without giving the union the first opportunity to refer workers to it.

The NLRB found that McKenzie's actions amounted to a repudiation of the collective bargaining agreement, in violation of 29 U.S.C. § 158(a)(1) (unfair labor practice to interfere with, coerce, or restrain employees in exercise of rights guaranteed under the NLRA) and § 158(a)(5) (unfair labor practice to refuse to bargain collectively with representatives chosen by employees). *See also NLRB v. W. L. Miller Co.*, 871 F.2d 745, 746, 748 (8th Cir. 1989) (pre-hire agreement binds employer for its term). McKenzie concedes that it withdrew recognition from the union and began hiring non-union workers but contends that no violation occurred, because the provisions of the collective bargaining agreement did not include the type of construction work involved in the Keokuk dam project. In support of its position, McKenzie relies on language in

the collective bargaining agreement that recognizes the existence of a separate agreement covering "Highway and Heavy construction work," and provides that "[t]his Agreement excludes work under the Highway and Heavy ... contract[]."

The "Highway and Heavy" contract, to which the union and certain contractors were signatories, covered work on "dams" and "breakwaters," which was arguably the type of construction work performed by the carpenters on the Keokuk dam project. Although McKenzie was not itself a party to the "Highway and Heavy" contract, it points out that the collective bargaining agreement does not state that an employer must be a signatory to that contract for the exclusion to apply. Thus, McKenzie contends, the collective bargaining agreement did not apply to the work on the Keokuk dam project, because that work was "work under [the] Highway and Heavy ... contract[]."

We agree with the NLRB, however, that this language in the collective bargaining agreement is at best ambiguous with respect to the central question here, namely, whether an employer who is not itself a party to the "Highway and Heavy" contract can nevertheless be engaged in work "under" that contract, and thus excepted from the coverage of the collective bargaining agreement. In light of this ambiguity, we think that the NLRB properly looked beyond the four corners of the agreement to consider the parties' practice, usage, and custom regarding the agreement. *See Transportation-Communication Employees Union v. Union Pacific Railroad Co.*, 385 U.S. 157, 161 (1966); *see also Rainbow Glass Co. v. Local Union No. 610*, 663 F.2d 814, 817 (8th Cir. 1981). We further note that where, as here, the terms of a collective bargaining agreement are ambiguous, questions of its interpretation must be resolved by the trier of fact, and we will accord deference to that interpretation. *See Central States, Southeast and Southwest Areas Pension Fund v. Kroger Co.*, 73 F.3d 727, 732 (7th Cir. 1996).

We think that substantial evidence exists in the record to support the NLRB's finding that both McKenzie and the union believed that the collective bargaining

agreement applied to the Keokuk dam project (and thus that it did in fact apply) and that both parties adhered to the terms of that agreement until McKenzie repudiated it in November, 1995. Since becoming incorporated in 1986, McKenzie had been a party to several successive collective bargaining agreements with the union and had followed the conditions set out in those agreements when hiring carpenters to perform work on earlier construction projects. When it began work on the Keokuk dam project in May, 1995, McKenzie continued its practice of hiring carpenters through the union and applying the terms of the collective bargaining agreement.

From May until November, neither McKenzie nor the union raised any question regarding the applicability of the agreement, or the possible exclusion of the Keokuk dam project under the "Highway and Heavy" contract provision. On the contrary, during that period McKenzie exclusively hired employees referred by the Union for carpentry work on the project and handled various employee complaints with the assistance of the union's business representative. McKenzie, moreover, deducted the amounts specified in the collective bargaining agreement for dues, vacation, and pension funds. Finally, statements by McKenzie's president suggest that he considered the union carpenters to be covered by the agreement: For example, he testified that during a dispute with the carpenters over their refusal to work in the rain, he said, "[Y]our contract doesn't read like that at all."

We therefore conclude that substantial evidence exists in the record to support the NLRB's finding that McKenzie repudiated the collective bargaining agreement with the union in violation of two sections of the NLRA. *See* 29 U.S.C. § 158(a)(1), § 158(a)(5). Indeed, McKenzie's posited construction of the agreement is barely plausible.

## II.

The NLRB also found that McKenzie discharged union carpenters Fred Arnold, Donald Patterson, Steve Perry, and Mark Spiekermeier because of their union

-4-

membership and as part of the company's plan to repudiate the collective bargaining agreement with the union, in violation of several provisions of the NLRA. *See* 29 U.S.C. § 158(a)(1), § 158(a)(3) (employer may not use discriminatory employment practices to discourage membership in labor organizations).

McKenzie points out that in the union's complaint to the NLRB, the NLRB General Counsel (who presents the union's position to the NLRB) alleged that McKenzie discharged the four union carpenters because they "assisted the Union and engaged in concerted activities," not because of their union membership or as part of the company's plan to sever relations with the union. Relying on this discrepancy, McKenzie contends that the NLRB violated due process by finding violations based on a "new 'theory' of liability" outside the scope of the allegations by the union without giving McKenzie notice and an opportunity to litigate the issue.

We disagree. It is clear from our precedents that "[a] respondent to an agency action ... has been accorded due process if the record shows that it understood the issues and was afforded a full opportunity to meet the charges." *Citizens State Bank v. FDIC*, 751 F.2d 209, 213 (8th Cir. 1984); *see also NLRB v. Mackay Radio and Telegraph Co.*, 304 U.S. 333, 350 (1938). Regardless of the specific allegations made in the complaint, we think that it is clear from the record that a significant portion of the litigation in this case focused on whether McKenzie discharged the employees in question as an integral part of its plan to terminate its relationship with the union. We believe that McKenzie had a full and fair opportunity to defend its decision to fire the union carpenters, and we therefore conclude that no due process violation occurred.

McKenzie also objects to the NLRB's factual findings and contends that it discharged all four carpenters for legitimate reasons unconnected to their union membership. The company maintains that it fired Mr. Arnold and Mr. Perry because they failed to show up for work on the morning of November 1. It further maintains that it fired Mr. Patterson and Mr. Spiekermeier because they engaged in a "work

stoppage" at the construction site that same day. The NLRB found, however, that McKenzie failed to show that the four employees would have been discharged for those reasons in the absence of a plan by McKenzie to terminate its relationship with the union. *See Pace Industries, Inc. v. NLRB*, 118 F.3d 585, 590 (8th Cir. 1997), *cert. denied*, 118 S. Ct. 1299 (1998) (in mixed-motive case, once NLRB General Counsel establishes *prima facie* case that protected conduct was motivating factor in employer's decision, burden of production shifts to employer to show that same action would have taken place in absence of protected conduct).

We think that the record contains sufficient evidence to support the NLRB's findings. McKenzie presented no evidence that it would have fired Mr. Arnold and Mr. Perry for their unexcused absences on November 1 if it had not intended to sever relations with the union. Although McKenzie's president testified that he complained to the union's business representative about the employees' absences on the morning of November 1, it is undisputed that the conversation contained no suggestion that McKenzie was considering discharging Mr. Arnold and Mr. Perry for their absences. Indeed, although McKenzie's president initially testified at the hearing before an administrative law judge that Mr. Perry was fired because of the November 1 absence, he later testified that Mr. Perry was a "very good" worker but was fired because "if you have three of them gone you might as well have the fourth one gone." We think that the NLRB reasonably found from this testimony that McKenzie's proffered reason for discharging Mr. Arnold and Mr. Perry was pretextual and that the carpenters were in fact fired as part of McKenzie's plan to sever its relationship with the union.

As for McKenzie's proffered reason for terminating Mr. Patterson and Mr. Spiekermeier, at the hearing both Mr. Patterson and Mr. Spiekermeier denied having engaged in a work stoppage on November 1. They further testified that the project supervisor called off work later that morning because it had started to rain and that they decided to stop at the union hall on their way home to chat with the union's business representative. All three men testified to the effect that McKenzie's president

walked into the business representative's office, asked Mr. Patterson and Mr. Spiekermeier why they were not at work, and then said, according to the business representative, "I quit, I'm getting my own people, you go your way, I'll go my way." The NLRB credited the testimony of Mr. Patterson, Mr. Spiekermeier, and the business representative over that of McKenzie's witnesses. After carefully reviewing the record, we see no reason to set aside the NLRB's credibility findings. *See Pace Industries, Inc.*, 118 F.3d at 590 (court affords great deference to NLRB's affirmation of administrative law judge's findings and credibility determinations).

We therefore conclude that sufficient evidence exists in the record to support the NLRB's finding that McKenzie fired Mr. Arnold, Mr. Patterson, Mr. Perry, and Mr. Spiekermeier because of their membership in the union and in furtherance of a plan to withdraw recognition from the union, in violation of two sections of the NLRA. *See* 29 U.S.C. § 158(a)(1), § 158(a)(3).

### III.

The NLRB also found that McKenzie violated 29 U.S.C. § 158(a)(1) by discouraging Vern Pascal, a diver hired by McKenzie to work on the Keokuk dam project, from joining the union and by encouraging him to withdraw his membership from the union after he had joined. We think that ample evidence exists in the record to support that finding.

Mr. Pascal testified that on two occasions McKenzie's president offered to pay him $2.00 per hour above the union's pay scale if he would refrain from joining the union. Mr. Pascal also testified that when the union's business representative approached him about joining, McKenzie's president stood behind the business representative throughout the conversation and shook his head "no." Finally, Mr. Pascal testified that a few weeks after he joined the union, and soon after McKenzie discharged the other union employees, McKenzie's president again approached him and explained that he "would like to do away with the union."

According to Mr. Pascal, McKenzie's president offered him a company-sponsored health plan and offered to reimburse the $250 union initiation fee that he had paid if he would withdraw his union membership.

In his own testimony, McKenzie's president offered alternative explanations for his discussions with Mr. Pascal regarding wages and benefits and for his negative headshaking during the conversation with the union's business representative. The NLRB credited the testimony of Mr. Pascal over that of McKenzie's president, however, and we defer to that credibility determination. *See Pace Industries, Inc.*, 118 F.3d at 590. We conclude that the record contains substantial evidence to support the NLRB's finding that McKenzie violated 29 U.S.C. § 158(a)(1) by offering Mr. Pascal economic inducements to dissuade him from joining, or continuing his membership in, the union.

IV.

McKenzie's president made several statements in the presence of his employees on the Keokuk dam project that the company "would have to go non-Union" and that unions "were on their way out." The NLRB found that these remarks had an "inherently coercive impact" upon the employees who overheard them and thus interfered with the employees' rights in violation of 29 U.S.C. § 158(a)(1). *See DeQueen General Hospital v. NLRB*, 744 F.2d 612, 614 (8th Cir. 1984) (test is whether employer engaged in conduct that reasonably tends to interfere with, restrain, or coerce employees in exercise of rights guaranteed by NLRA). McKenzie contests that finding.

In reviewing the NLRB's finding, this court "must recognize the Board's competence in the first instance to judge the impact of utterances made in the context of the employer-employee relationship." *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 620 (1969). After carefully reviewing the record, we believe that the NLRB was reasonable in determining that the statements in question amounted to an unlawful

attempt to interfere with the employees' right to union membership, in furtherance of a plan to terminate McKenzie's relationship with the union. We therefore conclude that substantial evidence exists in the record to support the NLRB's finding that those remarks violated 29 U.S.C. § 158(a)(1).

## V.

The NLRB issued a remedy order requiring, among other things, reinstatement and back pay for the four discharged union employees. McKenzie contends that reinstatement and back pay are inappropriate remedies because the Keokuk dam project has been completed and there is no evidence that McKenzie would have hired these same individuals for subsequent construction projects.

We believe, however, that the appropriateness of such a remedy should be resolved at the compliance stage of this proceeding. *See Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 902 (1984) ("courts have long recognized the Board's normal policy of modifying its general reinstatement and backpay remedy in subsequent compliance proceedings"). At the compliance proceeding, McKenzie will have a full opportunity to litigate the appropriateness of the NLRB's remedy and to avoid the reinstatement obligation altogether by showing that the union carpenters would not have been hired for work on subsequent projects. *See Amcar Division, ACF Industries, Inc. v. NLRB*, 592 F.2d 422, 432 (8th Cir. 1979) (determination of employees' entitlement to back pay was appropriate for litigation at subsequent compliance proceeding); *Dean General Contractors*, 285 N.L.R.B. 573, 573-75 (1987) (determination whether, absent discrimination, employer would have transferred employee to another jobsite upon termination of initial project is best resolved by factual inquiry at compliance proceeding).

## VI.

For the foregoing reasons, we deny McKenzie's petition for reversal and grant the NLRB's cross-petition for enforcement of its order.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.