# United States Court of Appeals

## For the Eighth Circuit

_____

No. 12-3585

_____

Allied Sales Drivers and Warehousemen, Local No. 289, International
Brotherhood of Teamsters; Teamsters Local No. 120

*Plaintiffs - Appellants*

v.

Sara Lee Bakery Group; Sara Lee Corporation

*Defendants - Appellees*

_____

Appeal from United States District Court
for the District of Minnesota - Minneapolis

_____

Submitted: October 23, 2013
Filed: March 19, 2014

_____

Before RILEY, Chief Judge, COLLOTON and KELLY, Circuit Judges.

_____

RILEY, Chief Judge.

Sara Lee Bakery Group of Sara Lee Corporation (Sara Lee[1]) and Allied Sales Drivers and Warehousemen, Local No. 289, International Brotherhood of Teamsters, and Teamsters Local No. 120 (collectively, "unions") entered into a collective bargaining agreement (CBA) and an outsourcing agreement. The outsourcing agreement permitted Sara Lee to outsource covered functions to a contract company provided the contract company hired from Sara Lee's displaced employees. If Sara Lee decided to outsource and "subsequently changes subcontractors," the outsourcing agreement also required that Sara Lee ensure the new contract company conform to "the then current labor agreement" for that agreement's "remaining term."

Sara Lee did outsource one of the covered functions, and the contract company hired Sara Lee's displaced employees. However, Sara Lee refused to require the contract company to adhere to the CBA for its remaining term, which the unions contended was a breach of the outsourcing agreement. In the ensuing litigation, the district court[2] granted Sara Lee's motion for summary judgment, reasoning the CBA had no "remaining term" to which the outsourcing agreement could apply. We affirm.[3]

---

[1]We follow the district court's lead in referring to appellee as "Sara Lee," which the district court explained as follows: "According to [appellees], on November 5, 2011, the Fresh Bakery division of the Sara Lee Corporation, known as Earthgrains Baking Companies, Inc., was sold and became part of BBU, Inc. Therefore, Earthgrains is the true [party]. However, because Sara Lee owned Earthgrains and its Fergus Falls bakery at all relevant times, the parties continue to use the term 'Sara Lee' to refer to [appellees] in their briefs."

[2]The Honorable Michael J. Davis, Chief Judge, United States District Court for the District of Minnesota.

[3]We have jurisdiction under 28 U.S.C. § 1291.

## I.    BACKGROUND

The CBA between Sara Lee and the unions covered sales employees, mechanics, and transport drivers at Sara Lee's location in Fergus Falls, Minnesota. The CBA's term ran from October 14, 2007, through October 9, 2010. This CBA purported to "embod[y] the entire agreement between the parties" and required that "any agreements modifying, changing or adding to [the CBA] must be in writing and signed by the parties." In March 2008, Sara Lee and the unions agreed in writing to an outsourcing agreement which allowed Sara Lee to outsource the Fergus Falls, Minnesota, transport/mechanic function without the unions' objection if a number of requirements were met. The most pertinent paragraphs read:

> [¶2] The parties agree that in the event a decision is made regarding the outsourcing of the Fergus Falls, MN transport/mechanic group, the new contracted company will fill its employment needs from the current transport drivers/mechanics who meet its qualifications and the new contracted company will recognize and acknowledge that Teamsters Local No[.] 289 and 120 is the duly authorized collective bargaining representative for all employees within the Fergus Falls, MN transport/mechanic group, and will bargain with Teamsters Local No. 289 and 120.

> [¶3] The parties agree that in the event a decision is made regarding the outsourcing of the Fergus Falls, MN transport/mechanic group, any employee on leave due to a work related injury at Sara Lee will be allowed to apply for employment opportunity with new contracted company on date he/she is released to full duty from the treating physician.

> [¶4] The parties agree that in the event a decision is made regarding the outsourcing of the Fergus Falls, MN transport/mechanic group, the new contracted company will recognize the seniority of current transport/mechanic employees that contracted company employs for purposes of vacation, holidays, layoff, and recall.

[¶5] The parties agree that in the event Sara Lee makes a decision to outsource transportation/mechanic and subsequently changes subcontractors for [the] transportation function at its Fergus Falls, MN locations Sara Lee will require any new subcontractor to accept the then current labor agreement for the remaining term of that agreement.

[¶6] The parties agree that in the event a decision is made regarding the outsourcing of the Fergus Falls, MN transport/mechanic group, that any individual not hired by the new contracted company will be entitled to severance . . . .

## A.     Outsourcing Transport Drivers

On July 19, 2010, David Strange, a manager with United Parcel Service Freight (UPS), contacted Sara Lee and proposed that Sara Lee outsource its transportation management and labor through a service package provided by UPS. This proposal was revised on August 5, 2010. Because providing labor was outside UPS's "business model," the revised proposal gave two outsourcing options, each with a different labor provider: (1) a contract with UPS under which IMSCO would provide the transport labor, or (2) a contract with UPS under which Transport Drivers, Inc. (TDI) would provide the transport labor. Sara Lee agreed to the proposal, choosing the option with TDI as the labor provider. On August 26, 2010, Sara Lee's representative notified its transport drivers and the unions that Sara Lee would be outsourcing the transport function as of October 10, 2010.

On August 27, 2010, TDI informed the unions that TDI would be taking over as the transport labor provider for the Fergus Falls, Minnesota, location. A few days later, TDI recognized the unions as the authorized bargaining representative for the transport drivers TDI expected to hire from Sara Lee and began negotiating a CBA with the unions. During negotiations, TDI proposed a CBA, but refused to accept the precise obligations contained in Sara Lee's CBA. With these negotiations still unsettled, TDI explained the situation in a September 16, 2010, letter sent to all of Sara Lee's displaced transport drivers. On September 27, 2010, TDI made

employment offers to each of the displaced drivers. Without a CBA between TDI and the unions, TDI offered to match the drivers' existing wages under Sara Lee's wage structure and to allow them to enroll in TDI's employee benefits programs. All of the outsourced drivers accepted, ending their employment with Sara Lee on October 9, 2010, and becoming TDI employees as of October 10, 2010.

The day after TDI's offer letter, Michael DeBuck, a representative for the unions, sent Sara Lee a letter requesting documents and agreements exchanged between Sara Lee and TDI, including all "information" provided to TDI to "assure [TDI's] compliance with the collective bargaining agreement." On October 7, 2010, DeBuck sent a second letter, apparently having never received a response to the first, explaining that TDI had refused to comply with the terms of the outsourcing agreement and requesting that Sara Lee "suspend all action relati[ng] to the outsourcing of bargaining unit work to TDI Nationwide." Jack Grissom, a Sara Lee representative, responded by asserting Sara Lee was complying with the agreement. TDI has continued to reject the precise obligations of the CBA.

## B. Concurrent CBA Negotiations

During September and October of 2010, with the outsourcing to TDI occurring in the background, Sara Lee and the unions negotiated regarding a new CBA to replace the old CBA upon its October 9, 2010, expiration. Several days before this expiration date, Grissom and DeBuck agreed to an extension agreement to facilitate continuing negotiations between Sara Lee and the unions after October 9, 2010. The substantive portion of the extension agreement read:

> The Teamsters Local Union 289 and [Sara Lee] hereby agree to extend the current [CBA] . . . covering bargaining unit employees at the Company's operations located in Fergus Falls, Minnesota.
>
> The CBA (currently set to expire on October 9, 2010) is hereby extended until 12:01 a.m., December 31, 2010. Further, [Sara Lee]

hereby agrees to incorporate a retroactive application of all negotiated items into the Memorandum of Agreement resulting from negotiations completed during this extension period.

Grissom signed this extension agreement on September 26, 2010, and DeBuck signed it on October 6, 2010.

Over a year later, Sara Lee and the unions concluded these negotiations by executing and signing a new CBA. The new CBA stated its term was "from October 10, 2010, to and including October 12, 2013." Like the old CBA, the new CBA "embodie[d] the entire agreement between the parties," and the parties agreed this new CBA did not cover the outsourced transport drivers.

## C.    Procedural History

On December 15, 2010, the unions filed suit against Sara Lee in Minnesota state court under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185. The unions' complaint alleged Sara Lee breached the outsourcing agreement by failing to ensure TDI's compliance with the old CBA as to the outsourced transport drivers. Sara Lee removed the case to federal court in the district of Minnesota.

On February 21, 2012, Sara Lee moved for summary judgment, arguing first that Sara Lee "has not subsequently changed" subcontractors as required in paragraph 5 of the outsourcing agreement and, second, that the old CBA had no "remaining term" to which the outsourcing agreement could apply.[4] The district court granted the motion, reasoning the old CBA had no "remaining term" on the date of outsourcing. Having already reached a basis for granting summary judgment, the district court refrained from deciding Sara Lee's primary argument. The unions timely appealed.

---

[4]Summary judgment also concerned a grievance by the unions on behalf of a transport driver whom TDI fired, and that claim is not at issue here.

## II.  DISCUSSION

"We review de novo the grant of a motion for summary judgment, viewing all evidence and making all reasonable inferences in the light most favorable to the nonmoving party." Inechien v. Nichols Aluminum, LLC, 728 F.3d 816, 819 (8th Cir. 2013).  We affirm only if the movant has shown "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

"Federal substantive law applies in suits under § 301, but we may look to consistent common law rules of contractual interpretation for guidance as long as their application is consistent with federal labor policies."  Int'l Union of Operating Eng'rs Local 571 v. Hawkins Constr. Co., 929 F.2d 1346, 1349 (8th Cir. 1991). Interpretation of a CBA begins with "the language of the documents which form the basis of the agreement."  Id.  "'In interpreting a collective bargaining agreement . . . we must construe the contract as a whole' . . . 'and read the terms of the agreement in their context.'"  Sheet Metal Workers Int'l Ass'n, Local No. 3 v. Lozier Corp., 255 F.3d 549, 551 (8th Cir. 2001) (first omission in original) (quoting Trinidad Corp. v. Nat'l Mar. Union of Am., Dist. No. 4, 81 F.3d 769, 772 (8th Cir. 1996)).  No terms should be meaningless.  See Hawkins Constr., 929 F.2d at 1349.

"The general rule is that if the contents of a contract are unambiguous, the intention of parties to the contract must be determined from the contract's contents." Id.  This is equally true with CBAs, see id., meaning "[e]xtrinsic evidence may not be considered 'for the purpose of showing that the parties intended to make an agreement which is inconsistent with the unambiguous words of their written contract.'" John Morrell & Co. v. Local Union 304A of United Food & Commercial Workers, 913 F.2d 544, 551 (8th Cir. 1990) (quoting St. Louis Union Trust Co. v. United States, 617 F.2d 1293, 1300 (8th Cir. 1980)).  Still, such evidence may be used "to demonstrate that ambiguity exists" in contractual language where that language "is reasonably susceptible of the meaning proposed."  Id.  Only upon a finding of

ambiguity does the agreement's meaning become a question of fact for the jury, at which point extrinsic evidence becomes an aid in its interpretation. See id.; see also McKenzie Eng'g Co. v. NLRB, 182 F.3d 622, 625-26 (8th Cir. 1999).

### A. Old CBA's Remaining Term

The district court correctly began "examining the language of the documents which form the basis of the agreement"—the old and new CBAs, the extension agreement, and the outsourcing agreement. Hawkins Constr., 929 F.2d at 1349. The difficulty arises from the agreements' apparent lack of clarity as to the expiration of the old CBA's term. Originally, the old CBA expired on October 9, 2010. And though the extension agreement purported to "extend" this CBA to December 31, 2010, the potential overlap created by the new CBA's October 10, 2010, start date seems to prevent the old CBA's term from having ended any later than its original October 9, 2010, date.

Faced with the apparent tension between the new CBA and the extension agreement, the district court reasoned the new CBA's retroactive term overrode any expansions of the old CBA's term, thereby solidifying the old CBA's October 9, 2010, end date. The district court reinforced this conclusion by looking to the context in which the parties signed the extension agreement and finding (1) the extension agreement was not intended to cover the transport drivers who would soon be displaced, and (2) in any case, Sara Lee had no authority to bargain for an extension with respect to these drivers. The unions argue the extension agreement unambiguously extended the old CBA's term through December 31, 2010, and the district court erred in looking to extrinsic evidence to exclude the outsourced transport drivers from the scope of the extension agreement. We find it unnecessary to address the extension agreement's impact (or lack thereof) on the old CBA's term or to reconcile this tangle of agreements, because the proposition that Sara Lee never

-8-

"subsequently change[d] subcontractors" provides a clear basis upon which to affirm.[5]

## B.    Subsequently Changes Subcontractors

The requirement in paragraph 5 of the outsourcing agreement only applied "in the event Sara Lee makes a decision to outsource transportation/mechanic and subsequently changes subcontractors for [the] transportation function at its Fergus Falls, MN locations."  The district court did not address whether the "subsequently changes subcontractors" condition was satisfied, yet that issue was briefed and argued extensively to the district court.  Sara Lee renews this argument on appeal.  Because the record is clear there was never a "change" of subcontractors, we affirm on this basis.  See Spirtas Co. v. Nautilus Ins. Co., 715 F.3d 667, 671 (8th Cir. 2013) ("'[A]n appellee may, without filing a cross-appeal, defend a judgment on any ground consistent with the record, even if rejected or ignored in the lower court.'" (alteration in original) (quoting Tiedeman v. Chi., Milwaukee, St. Paul & Pac. R.R. Co., 513 F.2d 1267, 1272 (8th Cir. 1975))).

Beginning with the outsourcing agreement's language, see Hawkins Constr., 929 F.2d at 1349, we find the parties' use of the word "change" both unambiguous and decisive.  By requiring that Sara Lee "change[] subcontractors," the agreement reasonably can only mean Sara Lee's replacement of one subcontractor with another. See Webster's Third New International Dictionary 373-74 (1993) (defining "change" as "to make different," "to replace with another or others of the same kind of class: remove, discard, or withdraw and replace with another," or "to switch to another"). As used in the outsourcing agreement, the word necessarily entails an initial hiring, termination, and a second hiring into the vacated space.

---

[5]The concurrence proposes a reasonable reading of the parties' agreement; however, it is not the only reasonable reading.

-9-

The language's context provides further support for this reading. See Sheet Metal Workers, 255 F.3d at 551 (requiring terms of CBAs be read in context). By requiring that "Sara Lee make[] a decision to outsource transportation/mechanic" work, paragraph 5 requires an initial act. Only after this initial outsourcing decision could Sara Lee "*subsequently* change[] subcontractors for [the] transportation function." (Emphasis added). By separating Sara Lee's acts and using the word "subsequently," the outsourcing agreement envisioned a distinct chronology for Sara Lee's actions, reinforcing the sequence of hiring, termination, and replacement suggested by the word "changed."

Had the parties intended to apply paragraph 5 to the initial outsourcing, they would not have broken from the pattern established in the agreement's surrounding paragraphs. Paragraphs 2, 3, 4, and 6 all began the same way: "The parties agree that in the event a decision is made regarding the outsourcing of the Fergus Falls, MN transport/mechanic group," followed by an obligation. By adopting this language in paragraphs 2 through 4, departing from it in paragraph 5, then reverting back in paragraph 6, the parties emphasized and clarified paragraph 5's added language required further action beyond the initial outsourcing. See Taracorp, Inc. v. NL Indus., Inc., 73 F.3d 738, 744 (7th Cir. 1996) ("[W]hen parties to the same contract use such different language to address parallel issues . . . , it is reasonable to infer that they intend this language to mean different things."); cf. Hawkins Constr., 929 F.3d at 1349 (requiring construction of a CBA that makes no term meaningless).

Finding no reasonable basis for an alternative reading, we conclude paragraph 5 unambiguously applied only to a company which replaced the role of a prior contract company as the provider of Sara Lee's transportation function. To avoid summary judgment, the unions had to demonstrate a genuine dispute as to whether TDI took over for a former contract company as to this function. See Gaston v. Teamsters Local 600, 614 F.3d 774, 779 (8th Cir. 2010) ("When the terms of a CBA are unambiguous, they are to be 'enforced strictly.'" (quoting Contempo

<u>Design, Inc. v. Chi. & N.E. Ill. Dist. Council of Carpenters</u>, 226 F.3d 535, 546 (7th Cir. 2000) (en banc))). The unions failed to do so.

The evidence shows the displaced transport drivers' employment with Sara Lee was severed as of midnight October 9, 2010, and on the next day each of the drivers began working for TDI. The unions point to no evidence, and we find none, which indicates UPS ever employed any of these drivers. At all points during the negotiations between Sara Lee and UPS, the understanding was that UPS would contract much of the work to a third-party labor provider because this aspect of the work was never part of UPS's "business model." There is a similar absence of evidence as to any other third-party contractor before TDI. Without some indication of a prior contract company in this role there could not have been a "subsequent change[]" to TDI. The unions have failed to establish a genuine dispute as to whether Sara Lee had any obligations respecting TDI under paragraph 5 of the outsourcing agreement.

## III.  CONCLUSION

Concluding the unions failed to establish a genuine dispute of material fact as to whether Sara Lee "subsequently change[d] subcontractors," Sara Lee was entitled to judgment as a matter of law, and we affirm.

COLLOTON, Circuit Judge, concurring in the judgment.

I would affirm the judgment of the district court on the ground that there was no "remaining term" of the collective bargaining agreement when Sara Lee made its decision to outsource transport drivers and allegedly changed subcontractors for transportation. Paragraph 5 of the Outsourcing Agreement provides that if Sara Lee makes a decision to outsource transportation drivers or mechanics, then it must "require any new subcontractor to accept the then current labor agreement for the remaining term of that agreement." Assuming for the sake of analysis that Sara Lee

subsequently changed subcontractors after making a decision to outsource, there was no "remaining term" of a then-current collective bargaining agreement that Sara Lee should have required a new subcontractor to accept.

The collective bargaining agreement between Sara Lee and Teamsters Local 289 ran from October 14, 2007 through and including October 9, 2010. Before the CBA expired, the parties signed an Extension Agreement in which they agreed to extend the CBA, "which was currently set to expire on October 9, 2010," until 12:01 a.m. on December 31, 2010. The agreement also provided that items negotiated during the "extension period" would be incorporated into any new agreement between the parties and applied retroactively.

The better reading of the Extension Agreement is that an "extension period" took effect on October 10, 2010, after the original CBA expired, and lasted through December 31, 2010. Although the parties signed the Extension Agreement on September 26 and October 6, respectively, and stated that the CBA was "hereby extended," the ordinary meaning of "extend" is to lengthen that which already exists. Therefore, the "extension period" took effect on October 10, 2010; the period between October 6 and October 9 was covered by the original agreement. Because the parties did not amend the original CBA, and the Extension Agreement does not provide that it supersedes the CBA itself, the extension did not replace the original term of the CBA.

As of October 10, 2010, the day the "extension period" began, the transport drivers were no longer bargaining unit employees of Sara Lee covered by the CBA. Sara Lee's obligation under the Outsourcing Agreement was to require any new subcontractor to accept the CBA for whatever period remained on the CBA when the drivers were outsourced. Because the CBA was set to expire October 9, 2010, there was no "remaining term" to the original CBA when the drivers were outsourced on October 10. Sara Lee thus did not violate the Outsourcing Agreement by failing to

require a putative new subcontractor to accept the terms of the CBA for transport drivers who were not bargaining unit employees.

The terms of a new, fully integrated CBA signed in October 2011 bolster this conclusion. The new CBA does not cover the outsourced transport drivers. As the Extension Agreement anticipated, the new CBA was made retroactive to the initial expiration of the old CBA and was effective from October 10, 2010 through October 12, 2013. These effective dates confirm that under the old CBA, there was no remaining term that covered the outsourced transport drivers as of October 10, 2010.

For these reasons, I concur in the judgment.

_____